*8 THOMPSON, Circuit Judge.
Petitioners Pavel Ivanov and Irina Ko-zochkina seek review of a final order of removal. They say the immigration courts erred by finding that the persecution Iva-nov experienced in Russia was not “on account of’ his Pentecostal faith. We agree. After careful consideration of the decision and the record, we vacate and remand for additional proceedings.
Facts and Procedural History
Petitioners are natives and citizens of Russia. Ivanov is a long-standing member of the Pentecostal Church, which Kozochk-ina, a Baptist, now attends.[1]
Petitioners entered the United States in May 2003 on five-month educational exchange visas.[2] Having heard from family and fellow Pentecostals in Russia of ongoing threats and violence against persons of their faith, Petitioners overstayed their visas and applied for asylum, withholding of removal, and relief under the Convention Against Torture (CAT) in September 2004.[3] Petitioners were married in Newport, Rhode Island in October 2004.
In August 2005, the Department of Homeland Security (DHS) served Petitioners with Notices to Appear, charging them with removability under the Immigration and Nationality Act. See 8 U.S.C. § 1227(a)(1)(B). Petitioners filed amended applications for asylum, withholding of removal, and CAT relief in June 2007. They appeared before an Immigration Judge (IJ) in a series of hearings between 2006 and 2009. Because the IJ found Ivanov credible, we recount the facts here as Iva-nov presented them in his documentation and testimony.
Ivanov was born in Chelyabinsk, Russia on November 21,1983. His parents raised him in the Pentecostal faith, practicing in secret during the anti-religious Soviet regime, then joining a church in 1995 as Russia began to open up to religion after the fall of communism.
Pentecostals represent a religious minority in Russia.[4] Though the Russian Constitution provides for freedom of religion, “[mjany citizens firmly believe that adherence to the Russian Orthodox Church ... is at the heart of their national identity,”[5] and “members of minority and ‘non-traditional’ religions,” including Pentecostals, “continue to encounter prejudice, societal discrimination, and in some cases physical attacks.”[6] Local authorities reportedly do not adequately respond *9 to such attacks.[7] For example, prior to 2005, Evangelicals and Pentecostals in various regions reported the vandalizing and burning of prayer houses, including in Iva-nov’s hometown of Chelyabinsk, where authorities made no arrests.[8]
Ivanov’s memories of problems for his church date back to March 1996, when he learned that members of the Russian Orthodox Church intercepted Pentecostal literature sent from France. Then, on January 7, 1997 (Orthodox Christmas), he heard that a group of “Barkashovtsy”— Russian nationalist, neo-Nazi “skinheads”[9] —had burned his church’s office and beat up the night watchman. Later, on May 30, 1999, while Ivanov and his parents were visiting their pastor’s home for Pentecost, a mob led by a disgraced Russian Orthodox priest attacked the home, beating the pastor’s wife, looting the premises, and burning religious literature.
Ivanov testified that he was personally mistreated because of his religious beliefs on several occasions. First, on November 21, 1999, during Ivanov’s baptism into the Pentecostal faith on his sixteenth birthday, bystanders heckled and threw bottles at celebrants during the initial ceremony at a public pool. That evening, while rites continued at the prayer house, skinheads burst in, shot rubber bullets, confiscated literature, and ransacked the house.
Second, on April 20, 2002, the anniversary of Hitler’s birth, skinheads attacked Ivanov as he left the church-run drug rehabilitation center where he volunteered.[10] His church operated the center as part of its mission of public service. Patients received medical treatment and followed a strict regimen of daily bible study.
That night, as Ivanov left the center, four young skinheads “knocked [him] down and dragged [him] 3 blocks” to a basement where he was “chained and beaten with full plastic water bottles.” They ■ handcuffed him, then-applied an electric shock to one hand and put cigarettes out on the other. They told him he had two days to figure out how to close the' church’s “ ‘satanic’ dispensary.” The skinheads then left Ivanov for nearly three ’ days without food and water. His parents filed a police report, but to their knowledge no action was taken. Fortunately, the skinheads released Ivanov of their own accord a few days later. It was only after Iva-nov’s. release that he realized the drug rehabilitation center’s work interfered with the skinheads’ lucrative drug trade.
Third, in February 2003, Ivanov “was summoned to the local police department.” There, a federal security service officer identified as Major Kozlov ordered Ivanov to provide false testimony in the prosecution of his pastor. Prosecutors accused *10 the pastor of using hypnosis to extort a ten-percent tithe from congregants. Major Kozlov told Ivanov he “would be sorry for not cooperating” with the prosecution.
A few days later, in early March 2003, four skinheads attacked Ivanov in the lobby of his apartment building. They beat him with batons while wearing rubber gloves, bruising his legs so severely that he missed school for a week. Although they wore no uniforms, Ivanov knew they were skinheads by the weapons they used. Because the beating occurred shortly after Ivanov’s conversation with Major Kozlov, Ivanov believes the skinheads were retaliating against him for his refusal to testify against his pastor. Ivanov called the police when he got back to his apartment, but no one ever came. Ivanov did not seek further police assistance or medical attention because he thought it would be futile.
Fourth, on April 22, 2003, unknown assailants threw Molotov cocktails at Iva-nov’s home in the middle of the night. Ivanov, his father, and his mother were home. Fortunately, Ivanov’s mother was awake and the family was able to put out the resulting fire. That same night, the church’s drug rehabilitation center also was set on fire. Ivanov did not see the people who threw the Molotov cocktails, but based on the perpetrators’ precision and the familiar timing of the attacks— almost exactly one year after skinheads accosted him as he left the center and just two days after “Hitler’s Birthday” — he believes the skinheads were again responsible. Petitioners left Russia and came to the United States roughly one month after this incident.
In his asylum application, Ivanov stated that he feared if he returned to Russia, skinheads would “sever[e]ly harm[] or kill[ ]” him, or the federal security service would imprison him on “trumped-up” charges or confine him to a mental facility under a false diagnosis, because of his membership in a “non-traditional” sect and his refusal to testify falsely against his pastor. At a hearing before the IJ in July 2007, after recounting his past mistreatment, Ivanov said he feared if he returned to Russia, “the same thing would [happen].” He also said he would “continue to be [subject] to the same lawlessness that [he] felt before.”
When Ivanov’s attorney asked if he had any fear of the government, Ivanov explained that it was “a well-known and established fact that ... the skinheads ... are connected to the government structure.” He elaborated that because he “look[ed] like [a] Russian” and his religious beliefs were not outwardly apparent, the only way the “young kids” who attacked him would know that he did not fit then-view of a “pure nation [or] pure race in Russia” is by the guidance or influence of “somebody from above.”
In July 2009, the IJ delivered an oral decision denying Petitioners relief. Although the IJ found Ivanov’s testimony to be credible and generally consistent, he determined that Ivanov “fell short of credibility” where he drew “conclusions ... from the facts” and engaged in “speculation ... with regard to the abusive activity of the skinheads.” Accepting for the sake of discussion that Ivanov’s experiences amounted to past persecution, the IJ dismissed Ivanov’s assertion that the skinheads were connected to government authorities as mere supposition without record support. He further concluded that Ivanov’s admission that “the skinheads wanted to close the [church’s] drug rehabilitation center because it was having a negative effect on their drug trade” meant that “[t]he motivation of the skinheads was an intention to profit by criminal activity, rather than to punish [Ivanov] *11 and others for engaging in the Pentecostal faith.” Finally, he found that Ivanov’s fear of return to Russia was based on “the general lawlessness of the place,” rather than abuse due to his religion.
As a result, the IJ found that Ivanov had not shown he experienced persecution “on account of’ a protected ground, and thus he failed to qualify for asylum. Iva-nov therefore also fell short of the more stringent standard for withholding of removal. Finally, Ivanov’s claim for CAT relief failed because there was no evidence that Ivanov had been or would be tortured at the hands of public officials or with the government’s acquiescence if he returned to Russia. The IJ consequently denied Petitioners’ applications but granted them voluntary departure.
Petitioners appealed. On review, the Board of Immigration Appeals (BIA) affirmed the IJ’s decision without opinion. This appeal followed.
Standard of Review
Ordinarily, we review decisions of the BIA, not the IJ. Larios v. Holder, 608 F.3d 105, 107 (1st Cir.2010). However, where, as here, “the BIA summarily affirms the IJ’s asylum determination, ... we review the IJ’s decision as if it were the decision of the BIA.” Id.
We review an IJ’s findings of fact, including the determination of whether persecution occurred on account of a protected ground, under the familiar and deferential substantial evidence standard. Lopez de Hincapie v. Gonzales, 494 F.3d 213, 217 (1st Cir.2007). Under this rule, we respect the IJ’s findings if “supported by reasonable, substantial, and probative evidence on the record considered as a whole.” Larios, 608 F.3d at 107 (quoting Immigration & Naturalization Serv. v. Elias-Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). However, “our deference is not unlimited,” and “we may not affirm [the IJ’s findings]” if “we cannot conscientiously find that the evidence supporting [them] is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [IJ’s] view.” Kartasheva v. Holder, 582 F.3d 96, 105 (1st Cir.2009) (citations omitted) (internal quotation marks omitted). Indeed, we are obligated to reject the IJ’s findings if a “reasonable adjudicator would be compelled to conclude to the contrary.” Precetaj v. Holder, 649 F.3d 72, 75 (1st Cir.2011) (quoting 8 U.S.C. § 1252(b)(4)(b)).
Discussion
We begin with a brief overview of pertinent asylum law. To qualify for asylum, an alien must establish that he is a refugee. 8 U.S.C. § 1158(b)(1)(A). A refugee is a person who is -unable or unwilling to return to his homeland “because of persecution or a well-founded fear of persecution on account of race, religion, nationality, -membership in a particular social group, or political ■ opinion.” 8 U.S.C. § 1101(a)(42). Proof of past persecution creates a presumption of a well-founded fear of future persecution that the government may rebut. Harutyunyan v. Gonzales, 421 F.3d 64, 67 (1st Cir.2005); see also 8 C.F.R. § 1208.13(b)(1).
Persecution is not defined by statute, but we know that it requires “more than ordinary harassment, mistreatment, or suffering.” Lopez de Hincapie, 494 F.3d at 217. To constitute persecution, abuse “must have reached a fairly high threshold of seriousness, as well as some regularity and frequency.” Rebenko v. Holder, 693 F.3d 87, 92 (1st Cir.2012) (quoting Alibeaj v. Gonzales, 469 F.3d 188, 191 (1st Cir.2006)) (internal quotation marks omitted).
*12 Persecution also “always implies some connection to government action or inaction,” whether in the form of direct government action, “government-supported action, or government’s unwillingness or inability to control private conduct.” Sok v. Mukasey, 526 F.3d 48, 54 (1st Cir.2008) (citations omitted) (internal quotation marks omitted); see also Burbiene v. Holder, 568 F.3d 251, 255 (1st Cir.2009). Local authorities’ failure to respond to prior persecution may demonstrate a government’s unwillingness or inability to control persecutors. Cf. Ortiz-Araniba v. Keisler, 505 F.3d 39, 42 (1st Cir.2007) (quoting Harutyunyan, 421 F.3d at 68) (“In determining whether a government is willing and able to control persecutors, ... a prompt response by local authorities to prior incidents is ‘the most telling datum.’ ”).
For purposes of asylum, an alien must also demonstrate that the persecution he experienced occurred “on account of’ a statutorily-protected ground. Lopez de Hincapie, 494 F.3d at 217. To meet this “nexus” requirement, an alien must provide sufficient evidence of an actual connection between the harm he suffered and his protected trait. Id. at 217-18. This does not require him “to identify [his] antagonists with absolute certainty,” id. at 219, or “to show that the impermissible motivation was the sole motivation for the persecution,” Sompotan v. Mukasey, 533 F.3d 63, 69 (1st Cir.2008) (citing In re S-P-, 21 I. & N. Dec. 486, 490 (BIA 1996)) (emphasis added). Rather, he must demonstrate only “that the persecution was based, ‘at least in part,’ on an impermissible motivation.” Id. (quoting Sanchez Jimenez v. U.S. Att’y Gen., 492 F.3d 1223, 1232-33 (11th Cir.2007)).
In many asylum cases, the central issue is whether the applicant’s story of past abuse is credible. Precetaj, 649 F.3d at 76. The IJ has “considerable latitude in evaluating credibility,” and its assessment receives substantial weight. Id.
In this case, the IJ found that Iva-nov’s testimony about the mistreatment he experienced was credible, generally internally consistent, and consistent with the record. Based on this testimony, the IJ observed it was “a close question” as to whether Ivanov established past persecution, but assumed for the purpose of discussion that he had done so. Relying on the IJ’s credibility determination, we find that Ivanov met the past persecution threshold.
As outlined above, Ivanov testified about four specific occasions of mistreatment because of his Pentecostal faith within a four-year period: (1) when skinheads violently interrupted his baptism ceremony at a prayer house in November 1999; (2) when skinheads attacked him as he left the church-run drug rehabilitation center where he volunteered, beat him up, handcuffed and shocked him, and left him in a basement for three days without food and water in April 2002; (3) when skinheads attacked him in his apartment lobby a few days after he refused to comply with a federal security officer’s forceful request that he testify against his pastor in March 2003; and (4) when unidentified assailants launched Molotov cocktails at his home in April 2003.
Ivanov also testified to a history of mistreatment of his congregation reaching back to his youth, including the repeated confiscation of religious literature, looting and burning of prayer houses, and violence against church members. Ivanov’s testimony was consistent with U.S. State Department human rights reports describing the mistreatment of Pentecostals and persons of other minority religions in Russia, *13 including incidents occurring on or around the anniversary of Hitler’s birth.[11]
Considered together, these events suggest a pattern of escalating abuse directed at Ivanov beginning the day he was baptized and continuing until he left the country. The harm Ivanov suffered, particularly during his three-day detention in April 2002, rose above “ordinary harassment, mistreatment, or suffering.” See Sok, 526 F.3d at 54 (six events occurring over the course of four years, considered together, suggested a pattern of abuse, where the most serious incident involved a three-day detention). Ivanov’s mistreatment occurred regularly and with some frequency for four years. Viewed within the broader context of intolerance and abuse of Pentecostals in Russia as docu: mented in the U.S. .State Department human rights reports, these incidents reach the “fairly high threshold of seriousness” required of persecution. See Pulisir v. Mukasey, 524 F.3d 302, 308-09 (1st Cir.2008) (“Common sense suggests that larger social, cultural, and political forces can lend valuable context to particular incidents and, thus, can influence the weight that a factfinder may assign to those incidents.”).
Seen in this context, these abuses also demonstrate the requisite nexus to government action or inaction. Here, Ivanov testified that his parents contacted the police when skinheads kidnapped him for three days in April 2002, but no follow-up action was taken. There is nothing in the record to suggest that Ivanov’s abusers were ever apprehended, punished, or even looked for, in spite of having severely beaten and detained him for three days.[12] This is consistent with reports that local authorities do not adequately respond to attacks against members of minority religious communities, including Pentecostals.[13]
Furthermore, skinheads attacked Ivanov in March 2003 only days after a federal security officer tried to intimidate him into testifying against his pastor. This fits with accounts that members of the federal security service “increasingly treat[] the leadership of some minority religious groups as security threats.”[14] It also aligns with religious leaders’ apprehensions “that Russian government officials provide tacit or active support to a view held by many ethnic Russians that Orthodoxy is the country’s so-called ‘true reli *14 gion.’ ”[15] Moreover, it shows that local authorities have significant opportunities to restrict individuals’ religious freedoms, leading to great variation between the laws on the books and national policies on the one hand, and the on-the-ground reality on the other.[16]
Ivanov contacted the police immediately after the March 2003 attack, but again no one came to his aid. As in April 2002, there is no evidence that the police made any efforts to apprehend or punish Iva-nov’s attackers. It is no wonder Ivanov thought further attempts to elicit police assistance would be “futile.”
Although the IJ did not credit Ivanov’s assertion that skinheads were “used by the police as surrogates” or “aided and abetted by the authorities,” Ivanov was not required to make such a showing to qualify for asylum. Ivanov had only to establish that the government was unable or unwilling to control the skinheads’ actions, see Sok, 526 F.3d at 53, and it appears clear from the record that this is the case. Local authorities either failed to take action against, or perhaps even supported, Iva-nov’s persecutors. Their failure to respond signals their unwillingness or inability to control Ivanov’s persecutors.[17] Cf. Ortiz-Araniba, 505 F.3d at 42. Accordingly, we make explicit what the IJ assumed and hold that Ivanov demonstrated past persecution linked to government action or inaction.
We next turn to the question of nexus to a protected ground. Although the IJ was willing to accept that Ivanov proved past persecution, he found that Ivanov did not establish a sufficient connection between the abuse he suffered and his religion. As set out above, the IJ provided two reasons for his finding: (1) he interpreted Ivanov’s admission that skinheads opposed the drug rehabilitation center because of its negative impact on their drug trade as an indication that they were not punishing Ivanov for engaging in his Pentecostal faith; and (2) he concluded that Ivanov’s fear of return to Russia was based on “the general lawlessness of the place, rather than mistreatment on account of’ his religion. Considering the record as a whole, we are unable to find that either of these rationales or the IJ’s ultimate determination was “supported by reasonable, substantial, and probative evidence.” [18]
First, the IJ’s fixation on the skinheads’ drug trade to the exclusion of any other motivation is misguided on principle and on fact. As a matter of principle, we do not require an alien to show that an impermissible motivation was the sole motivation for his persecution. Sompotan, 533 F.3d at 69. We have noted that aliens *15 “seldom know the ‘exact motivation[s]’ of their persecutors and, of course, persecutors may often have more than one motivation.” Id. (alteration in original) (quoting In re S-P-, 21 I. & N. Dec. at 490). Our sister circuits agree. See, e.g., Menghesha v. Gonzales, 450 F.3d 142, 148 (4th Cir.2006); Mohideen v. Gonzales, 416 F.3d 567, 570 (7th Cir.2005); Lukwago v. Ashcroft, 329 F.3d 157, 170 (3d Cir.2003); Girma v. Immigration & Naturalization Serv., 283 F.3d 664, 667 (5th Cir.2002); Borja v. Immigration & Naturalization Serv., 175 F.3d 732, 735-36 (9th Cir.1999) (en banc); Osorio v. Immigration & Naturalization Serv., 18 F.3d 1017, 1028 (2d Cir.1994).
The facts of this case illustrate the need for this principle. The IJ’s determination that the skinheads were motivated only by their “intention to profit by criminal activity” ignores both the skinheads’ overarching mission and the greater pattern of religiously-motivated abuse that Ivanov suffered. As Ivanov noted, the skinheads’ raison d’etre is to “purify the Russian nation.” They are notoriously xenophobic, racist, anti-Muslim, anti-Semitic, and, most relevantly here, intolerant of “adherents of ‘foreign’ religions.”[19] The skinheads who attacked Ivanov in April 2002 may indeed have had an economic interest in closing the church’s drug rehabilitation center. But they also, at their core, undoubtedly opposed the center’s religious mission and methods. The center’s religious message was inseparable from the service it performed: church volunteers operated the center and rigorous bible study was integral to patients’ treatment: Indeed, it appears that Ivanov’s skinhead assailants recognized this and gave voice to their anti-religious motivation when they told Ivanov to find a way to close the “satanic” center. That those skinheads may have had an additional motive for attacking Iva-nov cannot reasonably be read to refute that they were also acting upon the central motive underlying their group identity.
This is especially true given the other abuse that Ivanov suffered. Remember, the April 2002 attack is only one of four events supporting Ivanov’s asylum claim. In the other instances, Ivanov provided specific evidence of his attackers’ anti-Pentecostal motivation. For example, in November 1999, skinheads attacked his baptism ceremony at a prayer house. In March 2003, skinheads attacked him a few days after he refused to testify against his pastor. In April 2003, unknown assailants threw Molotov cocktails at his house the same night that. someone attacked the church’s drug rehabilitation center. Considered in view of the history of attacks against members of his church community and religious intolerance in Russia at-large, a reasonable adjudicator would be compelled to conclude that each of the attacks, including the attack in April 2002, was based, “at least in part,” on the impermissible motivation of Ivanov’s Pentecostal faith. See Sompotan, 533 F.3d at 69.
Second, the IJ’s interpretation of Iva-nov’s testimony that he feared “the same lawlessness” if he returned to Russia to mean that Ivanov feared “general lawlessness” in Russia runs counter to the record. The IJ appears to have construed Ivanov’s statement out of context: Ivanov said he feared “the same lawlessness” immediately after he described the specific instances of abuse discussed above, but the IJ took him to mean he feared “lawlessness” in Russia generally. To the contrary, Ivanov consistently maintained in his application and testimony that he feared if he returned to Russia skinheads .or government authorities would harm him due to his religious *16 beliefs.[20] The IJ’s monocular focus on Iva-nov’s remark, to the exclusion of the balance of Ivanov’s statements alleging specific fears of targeted persecution, is not supported by the record as a whole.
In sum, viewing the record in its entirety, including the evidence the IJ ignored or misconstrued, and relying on the IJ’s own finding that Ivanov’s testimony was generally credible, we cannot conscientiously find the IJ’s determination that Ivanov did not establish the requisite nexus between the persecution he suffered and his Pentecostal faith is supported by substantial evidence. While we are mindful of the deferential nature of our standard of review, we are also cognizant of our obligation to reject the IJ’s findings if, as here, a “reasonable adjudicator would be compelled to conclude to the contrary.” See Precetaj, 649 F.3d at 75 (quoting 8 U.S.C. § 1252(b)(4)(b)). It is not the first time we have rejected an IJ’s findings under this standard. See, e.g., id. at 76; Kartasheva, 582 F.3d at 105-06; Sok, 526 F.3d at 56, 58; Heng v. Gonzales, 493 F.3d 46, 49 (1st Cir.2007); Mukamusoni v. Ashcroft, 390 F.3d 110, 126 (1st Cir.2004). And so long as our review is not “a hollow exercise in rubber-stamping,” we doubt it will be the last. See Cuko v. Mukasey, 522 F.3d 32, 41 (1st Cir.2008) (Cyr, J., dissenting).
We therefore find that Ivanov has established his eligibility for asylum. Accordingly, we have no need to proceed to Petitioners’ requests for withholding of removal or relief under CAT, and we do not reach them here.
Conclusion
The order of the BIA affirming the IJ’s decision is vacated and the matter is remanded for proceedings consistent with this decision.

. Petitioners’ claims derive from Ivanov’s experiences as a Pentecostal in Russia in the 1990s and early 2000s. Given that Kozochki-na’s claims are derivative of Ivanov’s, we will discuss only Ivanov’s entitlement to relief.

. Petitioners' visas list September 2003 as their expiration date. However, because Petitioners never entered the educational programs for which their visas were issued, the government asserts that their status actually expired in June 2003, thirty days after their entry. This discrepancy is not relevant to this appeal.

. Because Petitioners missed the one-year filing deadline for asylum by only three months, the Immigration Judge gave Petitioners "the benefit of the doubt” and treated their claim as timely.

. United States Department of State, Bureau of Democracy, Human Rights and Labor, Russia: Country Reports on Human Rights Practices 20 (Mar.2007), available at http:// www.state.gov/j/drl/rls/hrrpl/2006/78835 .htm [hereinafter 2006 Country Report ].

. United States Department of State, Bureau of Democracy, Human Rights and Labor, Russia: International Religious Freedom Report 1 (Sept.2006), available at http://www. state.gov/j/drl/rls/irf/2006/71403 .htm [hereinafter 2006 Religious Freedom Report ].

. 2006 Country Report at 1.

. United States Commission on International Religious Freedom, Policy Focus on Russia 14 (Fall 2006) [hereinafter Policy Focus ].

. 2006 Religious Freedom Report at 15.

. Henceforth, “skinheads,” for ease of reference.

. Ivanov recounts that the skinheads were often more aggressive around the time of "Hitler’s Birthday.” He cites April 20, 2000, as another example of when skinheads attacked a Pentecostal prayer house. They wreaked havoc and covered the walls with insulting slurs and swastika graffiti. Luckily, no parishioners were present or harmed..
Ivanov's assertion that skinheads commemorate "Hitler’s Birthday” is confirmed by the 2006 Country Report, which highlighted a display of Nazi posters on April 20, 2005 as occurring “on the anniversary of Hitler's birth.” 2006 Country Report at 21. It also reported the firebombing of a Baptist church in Chelyabinsk and the arson of an Adventist church in another region during that same month (though it did not specify whether those events also occurred on April 20). Id. at 20.

. See 2006 Country Report at 1, 18-22; 2006 Religious Freedom Report at 9-15.

. We do not, as the dissent suggests, fault the police for not finding Ivanov during the days he was detained. We are certainly aware that even the best police work will not always enable police to halt a criminal in the act. However, here, there is no evidence of the police either seeking Ivanov while he was kidnapped or contacting Ivanov after he was released to try to find his attackers or to ensure his protection from future violence. We consider this to be the very definition of police inaction.

. Policy Focus at 14 (citing, inter alia, an attack by youths following a Pentecostal service in 2006 where authorities failed to act). Indeed, one of the U.S. Commission on Religious Freedom’s key concerns about Russia is “[t]he rise in xenophobia and ethnic and religious intolerance, resulting in an increased number of violent attacks and hate crimes, and the government's failure to address this serious problem adequately.” Id. at 3. Their report details a range of attacks motivated by religious or ethnic hatred and the authorities’ lackluster responses, such as classifying hate crimes as mere "hooliganism.” Id. at 3-6. The 2006 Country Report likewise noted that while "[a]uthorities usually investigated incidents of religious vandalism and violence, ... arrests of suspects were extremely infrequent and convictions were rare.” 2006 Country Report at 20.

.2006 Religious Freedom Report at 1.

. Policy Focus at 4.

. 2006 Country Report at 18-19.

. The dissent goes out of its way and far beyond the record to say we are assuming that only actual arrests by government authorities — in Russia or the United States— demonstrate their willingness or ability to control religious persecutors. We said no such thing. The evidence here not only shows a failure to arrest, but a total failure to investigate or follow up with Ivanov on any of the occasions he was attacked. This utter lack of intervention or action compels us to conclude Ivanov cannot live safely in Russia without facing persecution.

.Though the IJ did not point this out as a concern, we note preliminarily that Ivanov identified his antagonists with sufficient certainty. Ivanov’s use of the term “skinheads” to describe his attackers implies that they shared the common appearance symbolic of their group membership. Though they did not wear uniforms, Ivanov could also identify them by their choice of weapons: rubber batons and gloves in March 2003 and Molotov cocktails in April 2003.

. See 2006 Country Report at 33.

. There is also nothing in the record to indicate that Russia is awash in the type of general civil strife or violence that we have held would not qualify an applicant for asylum. See, e.g., López-Castro v. Holder, 577 F.3d 49, 54 (1st Cir.2009) ("A country-wide risk of victimization through economic terrorism is not the functional equivalent of a statutorily protected ground....”); Aguilar-Solis v. Immigration & Naturalization Serv., 168 F.3d 565, 572 (1st Cir.1999) (“Danger resulting from participation in general civil strife, without more, does not constitute persecution.”).