# United States Court of Appeals
## For the First Circuit

No. 19-1084

DARLIN ELEAZAR ENAMORADO-RODRIGUEZ,

Petitioner,

v.

WILLIAM P. BARR,[*]
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before
Lynch, Lipez, and Thompson,
<u>Circuit Judges</u>.

Joshua D. Asher, with whom Megan McEntee, David C. Soutter, and Ropes & Gray LLP were on brief for petitioner.
Jennifer A. Singer, Trial Attorney, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, with whom Kristen A. Giuffreda, Trial Attorney, Joseph H. Hunt, Assistant Attorney General, and Shelley R. Goad, Assistant Director, were on brief for respondent.

October 30, 2019

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Attorney General William P. Barr is substituted for former Acting Attorney General Matthew G. Whitaker as respondent.

**LYNCH**, **Circuit Judge**.    Darlin Eleazar Enamorado-Rodriguez ("Enamorado"), a Honduran national, came to the United States at age fifteen and sought asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  He asserted he had experienced past persecution on account of a protected ground, his membership in his mother's nuclear family, and would face future persecution.

Although the Immigration Judge ("IJ") found that Enamorado's testimony was credible, and that the abuse Enamorado suffered had indeed amounted to persecution, the IJ denied asylum relief.  He held that Enamorado had not met his burden to show the required nexus. The BIA affirmed, saying in part that Enamorado had failed to submit corroborative evidence.

We vacate the BIA's decision denying asylum and withholding of removal as to Enamorado's family membership persecution claim for relief, deny the relief Enamorado sought on alternate particular social group ("PSG") theories and for CAT relief, and remand the matter for proceedings on Enamorado's family membership persecution claim, consistent with this opinion.

I.

We describe first those facts relevant to our conclusion there was legal error.  Facts pertinent to our rejection of Enamorado's challenges to other claims are recited with the analyses of those claims.

Enamorado was born on January 22, 2000, in El Capuline, a small, isolated, mountainous village in the municipality of Santa Barbara, Honduras. According to the uncontradicted declaration of Enamorado's mother, Ruth Azucena Rodriguez Acosta, his father, Eleazar Enamorado Alberto, was addicted to drugs and physically abused her, including while she was pregnant with Enamorado. Days after Enamorado's birth, his father slapped his mother in front of his father's sister, who told Eleazar that he had to leave the family home. Eleazar did. Enamorado's mother then did not hear from his father for seven months. His mother then moved to San Pedro Sula with Enamorado so that she could live with her own mother.

Enamorado's father eventually came to San Pedro Sula, and when, after six months, his mother "decided to get back together with him," they rented a room together. Within a month, Enamorado's father resumed physically abusing his mother. His mother "was never able to tell anyone how" his father abused her and did not believe the police would take action if she reported his abuse. She eventually began to work in a clothes factory, and Enamorado's paternal grandmother, who then lived in San Pedro Sula, watched Enamorado while his mother worked. When Enamorado's grandmother decided to move back to El Capuline, she took Enamorado with her, and Enamorado's mother thereafter visited him and her

other child, Enamorado's sister, in El Capuline on weekends. Enamorado's father accompanied her only occasionally.

When Enamorado was four, he and his sister moved again to live with their parents in San Pedro Sula so that his sister could start school. His father continued to use drugs and physically abuse Enamorado's mother and both children. Eleazar then took Enamorado back to his father's parents in El Capuline and did not allow Enamorado's mother to visit or retrieve him.

When Enamorado was about six, his father tried to choke his mother in their home while their daughter watched. His mother told his father "to get out of the house," and the father then left Honduras for Mexico. His father told his own parents not to return Enamorado to his mother. Eleazar continued to threaten and harass Enamorado's mother by telephone, including threats to kill her. In fear, Enamorado's mother immediately fled Honduras for the United States without her children. She left her daughter with her cousin in San Pedro Sula. Her son, petitioner, remained with his grandparents in El Capuline.

From about age six to age ten, Enamorado remained with his father's parents in El Capuline in a house made of dirt and stone, with no telephone or electricity. Both of his grandparents "talked very bad" about his mother. They told Enamorado that his mother had left Honduras because she did not love him and that Enamorado's maternal grandmother had caused his parents'

- 4 -

separation. Enamorado's grandfather told him that his mother did not really love him because she had not come to say goodbye to him before leaving Honduras.

Enamorado's grandparents went well beyond his father's instruction not to return Enamorado to his mother or allow her to visit, refusing to allow him to see or speak to anyone in his mother's family. Enamorado's sister was then living with Eleazar's sister in another nearby town. When Enamorado asked his sister about their father, she started crying and said that their father had abused her.

During this period, Enamorado's grandparents physically and verbally abused him. On many occasions, his grandmother used a stick and rope to hit him, including on his back and his legs. His grandmother did not treat anyone else this way. His grandfather beat Enamorado with ropes used to tie horses, a water-soaked belt, or the straps of a horse saddle, and once threatened to hit Enamorado with the flat of a machete. His grandfather also verbally insulted Enamorado, calling him "stupid" and specifically referring to Enamorado's mother by calling Enamorado "son of a whore." Because of the distance between homes in El Capuline, neighbors were unaware of the abuse. The nearest police station was too far for Enamorado to travel to, and he believed the police would do nothing. Enamorado reported the abuse to his teachers but they did nothing.

When asked at the hearing why his life with his grandparents was "very bad," Enamorado testified that both his grandparents "mistreated [him] a lot because they hated [his] mother very much." His grandmother hit him because "she hated [his] mother very much." He added that his grandfather mistreated him because "he was going to raise [Enamorado] up whichever way he wanted, the same way he was raised, and he would tell [Enamorado] that [he had] to become a man." The government did not cross-examine Enamorado about his grandparents' motivations in abusing him.

Enamorado's grandfather eventually left El Capuline and did not return, leaving Enamorado alone with his grandmother. When Enamorado was nine or ten, his grandmother also eventually left, leaving Enamorado alone in El Capuline. His sister was living with their paternal aunt, about ninety minutes away on foot, and Enamorado could only visit infrequently. When he did, his aunt did not offer to take care of him. Enamorado did not try to leave El Capuline because his grandparents had told him to watch the house and because he lacked means to travel. He went hungry, had few clothes, and became very sick, including with dengue fever. He could not travel to the health clinic. When he was twelve or thirteen, Enamorado attempted suicide because of his sadness and loneliness, but his sister came to El Capuline and found him in time to prevent his death.

Enamorado's grandmother eventually returned to El Capuline. The house had been robbed during her absence, for which she blamed Enamorado and beat him. Enamorado began working, helping cousins in the fields.

The abuse was also committed by other members of Enamorado's father's family. Enamorado worked with a paternal cousin who often insulted him and his mother, calling him a "son of a whore." His cousin once threw a machete at Enamorado's hand, causing a deep cut.

His grandmother eventually left El Capuline again. When he was fifteen, Enamorado moved to San Pedro Sula to live with his sister and her partner. Men on the street threatened Enamorado with a weapon, asked him for money, and told him they could make him disappear. Enamorado also learned that the MS-13 gang had killed his paternal cousin, heightening his fear that he was in danger. Enamorado decided to go to the United States.

He entered the United States on July 13, 2015, near Hidalgo, Texas, was detained by immigration officials, and was released to live in East Boston with his mother, step-siblings, and half-siblings.

On February 28, 2018, Department of Homeland Security Investigations ("HSI") Gang Strike Force agents took Enamorado into custody because of his alleged association with MS-13 street gang members. In Immigration Court in Boston, Enamorado conceded

through counsel that he was removable and sought asylum, withholding of removal, and protection under the CAT.

II.

A.    Denial of Asylum Based on Family Relationship

Although the IJ had "some concerns regarding [Enamorado's] denials that he may be a gang member," he "ultimately . . . found [Enamorado] credible with respect to his claims of past harm in Honduras and the claim of future harm."  The IJ also found that "the frequency of the beatings by [Enamorado's] paternal grandparents, . . . the deprivation of food and medical help for [Enamorado] as a young child, [and] the abandonment of [Enamorado] by both his paternal grandparents" established that Enamorado had suffered harm sufficient to constitute persecution.

The IJ then found that Enamorado had not "provided sufficient evidence to establish that one central reason for the harm he suffered was on account of his family, including that of his nuclear family."  Reasoning that Enamorado "only offered his own speculation to support his position that he was persecuted on account of his family," the IJ found "insufficient evidence to establish a nexus to a protected ground or that one central reason [Enamorado] was targeted was on account of his family, as opposed to his grandparents' conceptions of masculinity or his grandparents' adherence to the manner of they were raised [sic]." The IJ did not reach the question of future persecution if

- 8 -

Enamorado returned to Honduras and did not consider whether the rebuttable presumption would apply.  See 8 C.F.R. § 208.13(b)(1).

The IJ acknowledged that Enamorado's mother provided a lengthy sworn declaration about the circumstances surrounding Enamorado's father's parents' mistreatment of him.  The IJ "place[d] minimal weight" on her declaration, "especially where she was available as a witness" but did not testify.  Apparently not considering the declaration to be corroborative evidence, the IJ concluded that Enamorado had failed to meet his burden through his testimony alone and was required to support his testimony with corroborative evidence.  The IJ also rejected the alternate claimed grounds for relief.

Enamorado appealed the IJ's decision to the BIA, arguing that the IJ's conclusion about Enamorado's grandparents' motivation in abusing him was clearly erroneous and based on an error of law.[1]

The BIA dismissed Enamorado's appeal and engaged in its own analysis.  It observed that Enamorado "testified that his grandmother beat him viciously because she hated his mother, but that his grandfather beat him because he wanted to raise [Enamorado] whatever way he wanted and desired to make him a man."

---

[1] Enamorado also argued that the IJ lacked jurisdiction because the Notice to Appear in Enamorado's case was defective under Pereira v. Sessions, 138 S. Ct. 2105 (2018), but he does not press this argument on appeal to this court.

In fact, this was a mischaracterization; Enamorado's testimony was that both his grandmother and his grandfather beat him because they hated his mother. The BIA concluded that, although Enamorado had "posit[ed] a plausible alternative motive to the one found by the [IJ]," such a showing was "insufficient to demonstrate clear error." The BIA also found that Enamorado had "not met his burden to corroborate his claim that he was harmed on account of his family membership," noting that he "had reasonably available witnesses but did not make them available for cross-examination." As a result, "[w]ithout additional corroboration, [Enamorado's] testimony, while credible, was not sufficient in this case."

When "the BIA conducts a de novo review of the record, independently validates the sufficiency of the evidence, and adopts the IJ's findings and conclusions, the IJ's findings become the BIA's." Laurent v. Ashcroft, 359 F.3d 59, 64 n.3 (1st Cir. 2004). We must uphold the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)) (internal quotation marks omitted).

To qualify for asylum, a person must establish that he or she is "someone who is unable or unwilling to return to his home country due to persecution or a well-founded fear of future persecution 'on account of race, religion, nationality, membership

in a particular social group, or political opinion.'" Silva v. Gonzales, 463 F.3d 68, 71 (1st Cir. 2006) (quoting 8 U.S.C. § 1101(a)(42)(A)). The person must show that one of the statutory protected grounds "was or will be at least one central reason for" his or her persecution. 8 U.S.C. § 1158(b)(1)(B)(i). Family membership is "a sufficiently permanent and distinct characteristic" to support an asylum claim. Ruiz v. Mukasey, 526 F.3d 31, 38 (1st Cir. 2008). If past persecution based on a protected ground is found, a presumption of future persecution arises and the burden shifts to the government to rebut that presumption. Orelien v. Gonzales, 467 F.3d 67, 71 (1st Cir. 2006).

Enamorado argues that the BIA committed legal error by failing to consider whether Enamorado's persecution had mixed motivations, that is, whether, despite the possible presence of another motivation, Enamorado's membership in his mother's family was at least one central reason for his persecution. He also argues that the BIA committed further error by requiring Enamorado to provide further evidence than he did to corroborate his testimony that he was persecuted based on his family.

The asylum statute provides that "the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added). Accordingly, "[w]e do not

- 11 -

require an asylum applicant to demonstrate that he was singled out only due to his protected trait," Ordonez-Quino v. Holder, 760 F.3d 80, 90 (1st Cir. 2014), and "the presence of a non-protected motivation does not render an applicant ineligible for refugee status," Aldana-Ramos v. Holder, 757 F.3d 9, 19 (1st Cir. 2014). "Rarely will an applicant know the 'exact motivation' of his persecutors--especially when he was victimized as a young child--and, 'of course, persecutors may often have more than one motivation.'" Ordonez-Quino, 760 F.3d at 90 (quoting Ivanov v. Holder, 736 F.3d 5, 15 (1st Cir. 2013)).

> As the Ninth Circuit has said, and we agree,
>
> an applicant need not prove that a protected ground was the most important reason why the persecution occurred. The Act states that a protected ground must constitute 'at least one' of the central reasons for persecutory conduct; it does not require that such reason account for 51% of the persecutors' motivation.

Parussimova v. Mukasey, 555 F.3d 734, 740 (9th Cir. 2009).

Nothing in the IJ's ruling reads that the IJ utilized a mixed-motive or "at least one central reason" analysis, as the statute requires. Enamorado's briefing to the IJ and the BIA did not waive this issue. Nor did the IJ's ruling explain how Enamorado's family membership was not "at least one central reason" for his persecution given Enamorado's uncontested testimony,

- 12 -

deemed credible by the IJ, that his grandmother and grandfather each beat him because each hated his mother.

The BIA did not recognize this error. Further, it focused on the grandfather's motivation, ignoring the grandmother's, and even then mischaracterized the testimony. We note that Enamorado's abuse continued during the period when he lived only with his grandmother because his grandfather had left El Capuline. The grandmother's persecution based on hatred of the mother may have been sufficient standing alone, but neither the IJ nor the BIA addressed this point.

Nothing in the record or the IJ's decision supports the conclusion that Enamorado's description of his grandfather's motivation, if different, also applied to his grandmother's motivation. The IJ's conclusion that Enamorado's abuse was motivated only by "his grandparents' conception of masculinity or his grandparents' adherence to the manner of they were raised [sic]" does not follow the required analysis.

Even on its own terms, the IJ's conclusion--that Enamorado's grandfather was motivated by his conception of masculinity or how he was raised--does not itself exclude that Enamorado's relationship to his mother motivated his grandfather's abuse.

Enamorado's grandfather may have been raised to believe that the "sins" of the mother (in not remaining with Enamorado's

father despite the beatings she suffered) should be visited on her son. Indeed, his grandparents did not say his mother left Honduras in light of the death threats received from the father. Rather, they told him his mother did not love him. And that belief is consistent with the grandfather's anger with the grandson for his status as his mother's child, calling Enamorado "son of a whore." Nor is Enamorado's grandfather's stated desire to ensure that Enamorado would "become a man" inconsistent with a motive based on Enamorado's being his mother's son. That is particularly so in light of the record evidence that family "violence against women is considered natural" in Honduras. Nothing in the IJ's decision addressed this.

The government responds that the IJ permissibly concluded that Enamorado did not meet his burden to show that his family membership was a cause of his persecution. The government stated at oral argument that Enamorado's testimony about his grandparents' motivation was speculation because he did not provide quoted specific statements that his grandparents made that demonstrated their hatred of his mother. The government offered no authority that an asylum applicant is required to establish the motivation for the persecution using direct quotes from the applicant's persecutor, and we are aware of none. It also argues that Enamorado's testimony was no more than his speculation about the reasons for his grandparents' abuse and therefore insufficient

on its own to demonstrate his entitlement to asylum.[2]  The BIA, however, did not call this evidence "speculation," and we reject that argument by the government as not an accurate summation of the record.

In the ordinary course, "[a]n alien may satisfy his burden of proving entitlement to asylum 'by [his] own testimony if that testimony is specific and credible.'"  Rivera-Coca v. Lynch, 844 F.3d 374, 379 (1st Cir. 2016) (quoting Chhay v. Mukasey, 540 F.3d 1, 6 (1st Cir. 2008)).  It is true that corroborative evidence may be required even if the applicant is credible.  8 U.S.C. § 1158(b)(1)(B)(ii).  Further, "[a] failure either to provide readily available corroborating evidence or to offer a compelling explanation for such a failure can be fatal to an asylum claim." Rivera-Coca, 844 F.3d at 379.  This is not a case where the applicant's testimony was weak, causing a greater need for corroborative evidence.  Mukamusoni v. Ashcroft, 390 F.3d 110, 122 (1st Cir. 2004).

But an asylum seeker need not provide such corroboration where "the applicant does not have the evidence and cannot

---

[2] The government also filed a Rule 28(j) letter about the Attorney General's decision in Matter of L-E-A-, 27 I. & N. Dec. 581 (A.G. 2019).  The issues it addresses are not before the court. The BIA decided this case under prior law, and the government's brief does not present the argument that Enamorado's maternal family was not a cognizable PSG.  Further, unlike in Matter of L-E-A-, the government in this case left it to Enamorado to establish the validity of his PSG, which he did.

reasonably obtain [it]." 8 U.S.C. § 1158(b)(1)(B)(ii). "[B]efore the failure to produce corroborating evidence can be held against an applicant, there must be explicit findings that (1) it was reasonable to expect the applicant to produce corroboration and (2) the applicant's failure to do so was not adequately explained." Soeung v. Holder, 677 F.3d 484, 488 (1st Cir. 2012).

The government's legal position as to corroboration fails. The IJ never informed Enamorado that he was required to provide further evidence by putting his mother on the stand despite her sworn declaration. There was no objection to consideration of her declaration and no request for cross-examination by the government. The stated reason for not considering her declaration does not strike us as sound, as we discuss below. The government does not argue that the declaration was not part of Enamorado's asylum application. See 8 C.F.R. § 1208.3(c)(1) ("[I]nformation provided in the [asylum] application may be used . . . to satisfy any burden of proof in . . . removal proceedings."); Mukamusoni, 390 F.3d at 121 (discounting improperly applicant's affidavit is "an error of law").

The IJ's decision notes that Enamorado's mother "was not offered for cross-examination notwithstanding her presence in the court," but it does not contain a finding that Enamorado's mother, who apparently refused to testify, was reasonably available to

- 16 -

take the stand. There is no explanation in the record for this refusal and no explanation of whether the mother thought she would jeopardize her own asylum application by testifying. Her mere presence in the courtroom does not itself establish that she was reasonably available to testify. As the government conceded at oral argument, the IJ made no "explicit finding[] that . . . it was reasonable to expect [Enamorado] to produce corroboration" of his grandparents' motives or that his failure to offer corroborative testimony was inadequately explained. See Soeung, 677 F.3d at 488.

The BIA independently referred to the need for corroborative evidence from other witnesses. But Enamorado testified that there were no other witnesses to his abuse because of the distance between homes in El Capuline, and the IJ did not explain on this record what further evidence was reasonably available despite Enamorado's youth and isolation at the time of the abuse. See Ordonez-Quino, 760 F.3d at 90 (acknowledging that a young victim of persecution will often have little evidence of persecutors' motivation). Despite our deference to findings made, "[w]e cannot read these findings into the record; they [must be] made explicitly in the first instance by the IJ and the BIA." Soeung, 677 F.3d at 489.

Here, the IJ found Enamorado credible with respect to his persecution and did not explain why, despite Enamorado's

credible, unrebutted testimony, his mother's sworn affidavit was not considered, or why it was reasonable to require further evidence to buttress Enamorado's proffered explanation of his grandparents' motives. Without such findings, "any holding that an otherwise credible claim is doomed because the petitioner failed to provide corroborating evidence directly conflicts with the applicable regulations." Mboowa v. Lynch, 795 F.3d 222, 226 n.3 (1st Cir. 2015) (citing 8 C.F.R. § 208.13(a)). This is the second error of law which requires us to remand for a proper analysis.

B.    Denial of Asylum Based on Enamorado's Other Proposed PSGs

Enamorado also claimed eligibility for asylum based on his membership in what he argued are three other PSGs: (1) Honduran children viewed as property by immediate family and unable to leave; (2) Honduran children lacking parental protection; and (3) young Honduran male deportees labeled as gang members by U.S. law enforcement. The IJ concluded that these proposed PSGs lacked the requisite particularity. The BIA affirmed. We deny the petition as to its attacks on the BIA's determinations that Enamorado's other proposed PSGs are not cognizable under the asylum statute.

"[A]n applicant seeking asylum or withholding of removal 'based on "membership in a particular social group" must establish that the group is: (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3)

socially distinct within the society in question.'" <u>Paiz-Morales</u> v. <u>Lynch</u>, 795 F.3d 238, 244 (1st Cir. 2015) (quoting <u>Matter of M-E-V-G-</u>, 26 I. & N. Dec. 227, 237 (BIA 2014)).

First, the IJ reasonably concluded that Enamorado did not show that his proposed PSGs of "Honduran children viewed as property by immediate family and unable to leave" and "Honduran children lacking parental protection" have the required particularity, finding that their ambiguous terms gave them no "definable boundaries." These descriptions are "ambiguous group characteristics, largely subjective." <u>Mendez-Barrera</u> v. <u>Holder</u>, 602 F.3d 21, 27 (1st Cir. 2010). Further, were Enamorado to return to Honduras, he would not be a child. <u>See</u> <u>Miranda-Bojorquez</u> v. <u>Barr</u>, 937 F.3d 1, 6 (1st Cir. 2019) (petitioner did not establish membership in a PSG of minor children because he was "no longer a minor").

Enamorado's third proposed PSG arises out of events after his arrival in Boston. On January 22, 2018, HSI labeled Enamorado "a VERIFIED and ACTIVE member of the MS-13 gang in the Boston metro area." HSI's conclusion was based on field reports gathered by the Boston Police Department, the Boston Regional Intelligence Center, the Boston School Police Department, and the Massachusetts State Police that Enamorado was seen interacting with certain other individuals, was seen in certain areas of East Boston, and was seen wearing apparel bearing gang symbols such as

- 19 -

the Chicago Bulls logo. Enamorado denies that he is or has been in the MS-13 gang. Because some of his paternal cousins are in the 18th Street Gang, he believes that reports that he is in the MS-13 gang may be fatal if he returns to Honduras. His third proposed PSG of young Honduran male deportees labeled as gang members by U.S. law enforcement is based on this fear.

The IJ reasonably concluded that Enamorado did not show that this proposed PSG has the required particularity, finding that the group is not viewed as socially distinct in Honduras. The record does not compel a conclusion that persons incorrectly perceived by U.S. law enforcement as gang members are themselves a distinct social group in Honduras. See Cantarero v. Holder, 734 F.3d 82, 86 (1st Cir. 2013).

C.  Denial of Relief Under CAT

The IJ's denial, and the BIA's affirmance, as to Enamorado's application for CAT protection is supported by substantial evidence. "A petitioner seeking CAT protection must show 'it is more likely than not' that he would be subject to torture 'by or with the acquiescence of a government official.'" Aldana-Ramos, 757 F.3d at 19 (quoting Nako v. Holder, 611 F.3d 45, 50 (1st Cir. 2010)). The IJ concluded that Enamorado had offered insufficient evidence of the needed government indifference, noting that Enamorado had never contacted the police in the past about his abuse and was never mistreated by a government official.

- 20 -

III.

The BIA's decision as to Enamorado's asylum and withholding of removal claims based on his persecution as a member of his mother's family was based on legal errors as described. The BIA's decision as to Enamorado's other proposed PSGs and his CAT claim, on the other hand, contained no legal errors and was supported by substantial evidence.

Enamorado asks us to find that the record compels a finding of his eligibility for asylum and to declare that he has established past persecution. But where the agency's decision was based on errors of law, we are required to remand to allow the agency to make its own finding using the correct legal standard. We may not make the finding ourselves in the first instance. See INS v. Orlando Ventura, 537 U.S. 12, 16 (2002) (per curiam); Castaneda-Castillo v. Gonzales, 488 F.3d 17, 22 (1st Cir. 2007) (en banc); Vumi v. Gonzales, 502 F.3d 150, 159 (2d Cir. 2007) (remanding to agency when agency did not use mixed-motive analysis).

We grant the petition in part and deny it in part, vacate the BIA's decision as to Enamorado's asylum and withholding of removal claims based on the PSG of family relationship, and remand for further proceedings on that claim consistent with this opinion.

**-Concurring Opinion Follows-**

- 21 -

**LIPEZ**, <u>Circuit Judge</u>, **concurring in part and concurring in the judgment.** Although there is much to admire in the majority opinion, I disagree that the agency decisionmakers committed legal error by failing to apply the mixed-motive standard. The IJ's and BIA's analyses show that they used the correct standard. The error lies elsewhere -- reaching a conclusion on the nexus element that is not supported by the evidence.[3] This record compels a finding that at least one central reason for Enamorado's persecution was membership in his mother's family. Hence, I would hold that Enamorado has established that he was persecuted on the basis of a protected ground. In my view, the proceedings on remand should first focus on whether the government is unwilling or unable to protect Enamorado from such persecution. <u>See</u> <u>Rosales Justo</u> v. <u>Sessions</u>, 895 F.3d 154, 162 (1st Cir. 2018). If so, he will then have the benefit of a rebuttable presumption of future persecution, which the remand proceedings would then address. <u>See</u> <u>Rivera-Coca</u> v. <u>Lynch</u>, 844 F.3d 374, 378-79 (1st Cir. 2016).

---

[3] As the majority notes, when, as in this case, "the BIA conducts a de novo review of the record, independently validates the sufficiency of the evidence, and adopts the IJ's findings and conclusions, the IJ's findings become the BIA's." <u>Laurent</u> v. <u>Ashcroft</u>, 359 F.3d 59, 64 n.3 (1st Cir. 2004). However, for clarity, I will refer to both the IJ's and BIA's decisions as appropriate to my analysis.

## I. The Agency's Decision on Mixed Motive

The IJ concluded, and the BIA affirmed, that Enamorado failed to provide "sufficient evidence to establish that one central reason for the harm he suffered was on account of his family, including that of his nuclear family." In reaching that conclusion, the IJ noted that the statute governing asylum requires that membership in a particular social group be "at least one central reason" for an asylum applicant's persecution. The IJ further stated that "[t]he key question is whether the evidence indicated that the persecutors 'had any animus against the family or the respondent based on their biological ties, historical status, or other features relating to the family's unit.'" IJ Op. at 15 (quoting Matter of L-E-A-, 27 I. & N. Dec. 40, 47 (B.I.A. 2017)). After articulating this correct legal standard, the IJ acknowledged the petitioner's testimony that he had been persecuted on account of his membership in his family but rejected it as insufficient to establish the required nexus. The IJ concluded that the record supported only one conclusion: that Enamorado's grandparents abused him because of their "conception of masculinity" or a commitment to raise Enamorado in the way that they were raised.

The BIA affirmed the IJ's conclusion, finding no clear error in the IJ's factual determination that Enamorado had failed to establish the required family-motivated nexus. Like the IJ,

- 23 -

the BIA acknowledged the petitioner's evidence that he was persecuted by his grandparents because of his family membership -- his paternal grandparents hated his mother -- but concluded that, although this alternative motive for the abuse was plausible, the IJ's rejection of it did not amount to clear error.

To be sure, neither the IJ nor the BIA explicitly invoked the mixed-motive analysis. But the legal framework articulated by each of them makes clear that the IJ applied that standard and that the BIA reviewed its application. The IJ acknowledged the evidence supporting an additional motive, but he concluded that the evidence was insufficient. The BIA affirmed this analysis. Thus, in my view, the BIA did not commit legal error by failing to engage in a mixed-motive analysis. Rather, as detailed below, the agency erred in reaching a conclusion regarding the nexus element that disregarded the compelling evidence of family-based motivation.

## II. The Evidence of Mixed Motive

We review the IJ's findings of fact, adopted by the BIA, under the substantial evidence standard, which requires that we respect findings "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Ordonez-Quino v. Holder, 760 F.3d 80, 87 (1st Cir. 2014) (quoting Larios

v. Holder, 608 F.3d 105, 107 (1st Cir. 2010)).[4] There is substantial evidence to support the agency's findings if the record does not compel a contrary factual finding but simply "supports a conclusion contrary to that reached by the BIA." See Hincapie v. Gonzales, 494 F.3d 213, 218 (1st Cir. 2007) (citing I.N.S. v. Elias-Zacaris, 502 U.S. 478, 481 n.1 (1992)). If, however, the record viewed in its entirety would compel a reasonable fact-finder to reach a contrary conclusion, "'our deference is not unlimited,' and we must reject . . . the IJ's findings." Ordonez-Quino, 760 F.3d at 87 (quoting Ivanov v. Holder, 736 F.3d 5, 11 (1st Cir. 2013)).

As the majority's thorough recitation of the evidence reveals, multiple factors compel a finding regarding nexus contrary to that reached by the IJ and affirmed by the BIA. First, Enamorado provided specific testimony not only about his grandparents' abusive treatment, but also about specific statements and actions that led him to believe that they persecuted him because they hated his mother. He testified that his grandparents prohibited him from seeing or speaking with anyone in his mother's family, talked "very bad" about his mother, told him that his mother did not love him, and called him a "son of a whore" repeatedly. He also testified that both of his grandparents

---

[4] Whether persecution occurred "on account of a protected ground" is a finding of fact. Ordonez-Quino, 760 F.3d at 87.

- 25 -

abused him "because they hated [his] mother very much" and that his grandmother hit him because "she hated [his] mother very much." The government did not attempt to discredit Enamorado's testimony concerning the family-based reason for his treatment; it did not cross-examine him on any of his statements regarding his grandparents' abuse or their motivations.

Second, and perhaps most significantly, the IJ found this testimony credible, but selectively -- and arbitrarily -- relied on it in reaching his nexus finding about the motivation of the grandparents. Despite Enamorado's lengthy testimony describing his grandparents' hatred of his mother, the IJ cherrypicked a single statement from Enamorado's unrebutted, credible testimony to conclude that his grandparents' motivation for abusing him was their conception of masculinity or an adherence to raising him as they were raised. In other words, in making his nexus finding, the IJ relied exclusively on one piece of Enamorado's testimony -- notably, the sole part of his testimony that supported a motivation other than one protected by asylum law -- but then disregarded the rest of that testimony, despite all of it coming from the same source deemed credible by the IJ. This inconsistent treatment of Enamorado's uncontested, credible testimony cannot be upheld. When the petitioner's testimony is properly viewed in its entirety, along with the rest of the record

evidence, we must conclude that Enamorado has established that his persecution was on account of his family membership.

That the record compels this contrary conclusion is perhaps most obvious when considering the grandmother's motivations for abusing Enamorado. Although the petitioner stated that his grandfather abused him because of his view of masculinity, he never said the same of his grandmother. The IJ completely disregarded this fact. Indeed, there is no evidence in the record that supports the IJ's conclusion that Enamorado's grandmother was motivated by her view of masculinity or a commitment to raise the petitioner as she was raised. And, as the majority points out, the petitioner was abused by his grandmother, even when his grandfather was not living with them.

Third, as the majority correctly emphasizes, the IJ improperly rejected as "speculation" Enamorado's testimony that his grandparents' hatred of his mother was one cause for his abuse. In support of this view, the IJ cited Villalta-Martinez v. Sessions, 882 F.3d 20 (1st Cir. 2018), in which the court also referred to an asylum applicant's testimony as speculation. See id. at 25. However, that case and other asylum cases involving "speculative" testimony are readily distinguishable from the unique circumstances presented here.

In Villalta-Martinez, the petitioner asserted that gangs extorted money from her while she was working at a store owned by

her romantic partner because of her membership in his family.  Id. at 23-24.  The IJ found, and the BIA affirmed, that Villalta-Martinez had failed to present evidence demonstrating that the gang members targeted her for any reason other than to extort money from her.  Id. at 24.  In affirming that decision, our court noted that the petitioner provided only her own speculation to support her contention that one central reason for her persecution was her relationship to her partner.  Id. at 25.  Indeed, the petitioner had not provided evidence that these unidentified gang members even knew of her relationship to him.  Id. at 24.  Moreover, her testimony suggested that she was not singled out by the gang members.  All of the employees at the store were threatened by the gang, undercutting her contention that it was her unique relationship to her partner that motivated the gang's actions.  Id. at 23-24.  We similarly have affirmed the BIA's denials of asylum petitions where a petitioner's evidence of the nexus element is limited to the petitioner's own theory about a stranger's motivation for persecuting him or her.  See, e.g., Giraldo-Pabon v. Lynch, 840 F.3d 21, 25 (1st Cir. 2016) (affirming the BIA's conclusion that the petitioner's "own belief that another cousin was stabbed because of her family members' involvement in narco-trafficking" did not establish the requisite nexus).

Enamorado's testimony regarding his grandparents' actions and statements -- and his own inference about their

motivations for abusing him -- is not "speculation" in the same sense. Enamorado could not, of course, testify with certainty about his grandparents' state of mind. But an inference anchored in direct, intimate interactions with his abusive grandparents with whom he lived is as well supported as can reasonably be expected. And, relatedly, Enamorado is the best source, aside from his abusers themselves, for insight into the reasons he was persecuted, particularly given that he lived during his years of abuse in a mountainous, remote village, far from police, medical facilities, or even other family.

Accordingly, given the specific circumstances of petitioner's abusive treatment, there is not substantial evidence to support the IJ's conclusion on nexus, adopted by the BIA, when the record is viewed as a whole. Rather, the record compels a finding that at least one central reason for the grandparents' abuse was Enamorado's membership in his mother's family. In my view, that conclusion follows regardless of the error, which I agree was made, as to corroborative evidence. Thus, I cannot join the mixed-motive discussion in Section II.A of the majority's decision.[5]

_____

[5] I do, however, agree with the majority's analysis of the corroboration error in Section II.A, Enamorado's other proposed PSGs, and relief under CAT.

## III. Conclusion

There is only one conclusion to draw from this record -- Enamorado has established that he was persecuted on the basis of his family membership.  In my view, the proceedings on remand should first focus on the government's unwillingness or inability to protect him from this persecution.[6]  If that is the case, Enamorado would then have the benefit of a rebuttable presumption of future persecution, which would also be addressed in the remand proceedings.

---

[6] When an asylum applicant is persecuted by a private actor, rather than the government itself, he or she has "the burden of proving that the government was either 'unwilling or unable' to protect him [or her] from persecution."  Rosales Justo, 895 F.3d at 162 (quoting Burbiene v. Holder, 568 F.3d 251, 255 (1st Cir. 2009)).   The petitioner attempted to meet this burden in the proceedings below.  However, because the IJ found that Enamorado had not established the nexus element, the IJ did not reach a conclusion about the "unwilling or unable" element.