**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-1305

MARIA MORALES,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued:  September 16, 2022                    Decided:  October 24, 2022

Before WILKINSON, WYNN, and DIAZ, Circuit Judges.

Petition for review denied in part and dismissed in part by published opinion. Judge Wilkinson wrote the opinion in which Judge Wynn and Judge Diaz joined.

**ARGUED:**  Ronald Darwin Richey, LAW OFFICE OF RONALD D. RICHEY, Rockville, Maryland, for Petitioner.  Jennifer A. Singer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Jeffrey Bossert Clark, Acting Assistant Attorney General, Shelley R. Goad, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

WILKINSON, Circuit Judge:

Maria Segunda Morales, a native of El Salvador, filed this petition for review of an order of the Board of Immigration Appeals (BIA) denying her petition for asylum, withholding of removal, and relief under the U.N. Convention Against Torture (CAT). She contends chiefly that the BIA and immigration judge (IJ) erred in rejecting her claim of persecution on account of "membership in a particular social group"—a precondition for her asylum claim under 8 U.S.C. § 1158(b). For the reasons that follow, we deny in part and dismiss in part the petition for review.

## I.

In the fall of 2015, then fifty-three-year-old Maria Morales crossed the Rio Grande into Texas. Six days after her arrival, federal authorities located her close to a hundred miles from the southern border. Questioned at that time by a border patrol agent, Morales explained that she had come to the United States to "look for work" and denied fearing persecution or torture in El Salvador. She was subsequently detained in Tacoma, Washington, and charged—pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I)—with removal for lacking a valid entry document.

Weeks later, before a Tacoma-based immigration judge, Morales announced her intention to apply for asylum. With the aid of counsel, she submitted an application, complete with additional claims for withholding of removal and CAT protection. Two days after filing, Morales posted bond of $7,500 and moved to Maryland to live with her adult son, who had illegally entered the United States years earlier.

2

The merits of Morales's application eventually went before a Baltimore-based immigration judge in March 2018. At a hearing, Morales testified that she had been raped by a cousin in El Salvador and abused by an ex-partner, who fathered her son, left her, returned, and is now deceased. Morales added, however, that her cousin was alive and had threatened her as recently as 2015 but not physically harmed her since the 1970s. Morales also discussed a robbery by MS-13 gang members that she alleges witnessing in September 2015. She testified that she cooperated with police on the scene, indicating where the robbers had hidden their weapons. A few days later, three unknown men with tattoos came by her house and threatened her with a gun, she recounted. Morales said that she then filed a police report about the incident and, roughly a month later, left for the United States. She further testified that, since her departure, a niece, nephew, and uncle have been killed—crimes which she suggested might be retaliation by the MS-13 gang for her assistance to police.

The immigration judge denied Morales's application. Among other things, the immigration judge noted "inconsistencies" in her account. Morales had initially failed to recall past visa applications to the United States, the immigration judge observed, including one making a factual misrepresentation. A.R. 25. Morales appealed to the Board of Immigration Appeals but did not submit new briefing. For her CAT claim, she wrote in the notice of appeal that the immigration judge had erred "because [she] testified credibly and consistently." A.R. 11. In February 2020, the Board dismissed her appeal.

Morales filed a timely petition for review.

3

## II.

To prevail on a claim for asylum, applicants have the burden of establishing "refugee" status. 8 U.S.C. § 1158(b)(1)(B)(i). As defined by Congress, this status requires a showing that "race, religion, nationality, membership in a particular social group, or political opinion" was or will be a "central reason" for persecution. *Id.* The same requirement holds for a withholding-of-removal claim, except that the applicant there must satisfy a higher standard of proof. *See* 8 U.S.C. § 1231(b)(3)(A). Accordingly, if Morales does not succeed in her asylum claim, she is also "necessarily ineligible for withholding of removal." *Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004).

Of all the protected classes, "membership in a particular social group" has created the most definitional difficulty. Human beings are sociable by nature. Many, if not most, belong to multiple social groups, thus leaving that ground for asylum one of perennially uncertain application. "Membership in a particular social group" was the focus of the Morales application. For refugee status, she asserted—and agency adjudicators rejected— three social groups: (i) Salvadorean women who are witnesses to gang criminal activity and targeted because they filed a police report; (ii) Salvadorean women who are in a domestic relationship that they are unable to leave; and (iii) family. We now hold, in agreement with the Board, that all three proposed groups are unavailing. In particular, as detailed below, Morales did not demonstrate the first to be cognizable, the second to include her, or the third to be a "central reason" for her alleged persecution. Because we are unable to grant Morales's petition as to her asylum claim, we are necessarily prevented from doing so as well as to her withholding-of-removal claim.

4

A.

We begin by evaluating Morales's first proposed social group: *Salvadorean women who are witnesses to gang criminal activity and targeted because they filed a police report.* Just articulating a social group is not enough, however. The relevant statutory language features a crucial modifier: "particular." Whether Morales's self-styled group is particular—and thus cognizable—is a question of law, which we review de novo. *See Tairou v. Whitaker*, 909 F.3d 702, 706 (4th Cir. 2018).

Our legal analysis does not start from a blank slate. When addressing the Immigration and Nationality Act, as we do here, we owe deference to reasonable interpretations by the Board. *See id.* (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–45 (1984)). And a "particular social group," the Board has explained, must be (i) "composed of members who share a common immutable characteristic," (ii) "defined with particularity," and (iii) "socially distinct within the society in question." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (BIA 2014). This definition is constraining by design, lest "the social group concept . . . virtually swallow the entire refugee definition." *Nolasco v. Garland*, 7 F.4th 180, 187 (4th Cir. 2021) (quoting *Matter of M-E-V-G-*, 26 I. & N. Dec. at 231 (internal quotation marks omitted)). The parties do not ask us to abandon the Board's three-part definition, and we are not so inclined. This court, by now, has appealed to the definition in multiple decisions, without once finding it to be impermissible. *See, e.g.*, *Quintero v. Garland*, 998 F.3d 612, 632 (4th Cir. 2021) (finding this court to have "adopt[ed]" the definition).

5

Morales's proposed social group must consequently be "defined with particularity." Put otherwise, her group must erect "definable boundaries so that it is sufficiently clear who is in and out." *Herrera-Martinez v. Garland*, 22 F.4th 173, 181 (4th Cir. 2022) (quoting *Amaya v. Rosen*, 986 F.3d 424, 429 (4th Cir. 2021) (internal quotation marks omitted)). The problem for Morales is that the traits of her proposed group are instead "amorphous, overbroad, diffuse, [and] subjective." *Id*. The term, "witnesses," for example, could plausibly refer to bystanders, informants, or those who testify in court. This court thus held earlier in the year that an applicant's proposed group, "prosecution witnesses," lacked particularity. *Id.* at 183.

Although Morales counters that her proposed group adds more limiting language, the "collection of traits" here does not sharpen the boundary lines. *Temu v. Holder*, 740 F.3d 887, 896 (4th Cir. 2014). "Criminal activity" could span "offenses ranging in severity from petty theft to first-degree murder." *Lizama v. Holder*, 629 F.3d 440, 447 (4th Cir. 2011). We have, in fact, rejected "criminal history" as an insufficiently particular trait, reasoning that the term could "mean anything from a reputation for committing crimes to an actual criminal record." *Id.* Similarly, the term, "targeted," could refer to exposure to physical harm, verbal threats, or some other kind of lesser attention. Morales's medley of vague traits ultimately bleeds into those of the general Salvadorean population, thereby undermining the very "purpose" of the particularity requirement: "to avoid indeterminacy." *Herrera-Martinez*, 22 F.4th at 181 (internal quotation marks omitted).

Morales fares no better with the "socially distinct" criterion of the Board's definition. Though this requirement does not mean that a group's members must be

6

identifiable "on sight," it does necessitate evidence that society generally considers them to form a group. *Nolasco,* 7 F.4th at 187–88 (quoting *Matter of M-E-V-G-*, 26 I. & N. Dec. at 240). It is not enough that members of the proposed group see themselves as socially distinct. What matters is the view of Salvadorean society as a whole. Morales has not, however, marshalled adequate evidence that Salvadorean society views her proposed group as "set apart . . . in some significant way." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 238.

Morales responds by invoking a State Department report which suggests a "climate of impunity from criminal prosecution" reigns in El Salvador. A.R. 160. The Salvadorean government's "abysmal efforts" to keep witnesses safe, Morales contends, are proof that society at large "recognize[s] [them] as particular and socially distinct." Pet'r Br. 23. But the Salvadorean government fails to keep *all kinds of people* safe. According to the very State Department report that Morales supplied, gangs in El Salvador partake in the rampant "[i]ntimidation and killing of police officers, crime victims, and witnesses." A.R. 160. The record indicates, quite sadly, that gang violence afflicts large swaths of the Salvadorean public. But this general condition means that Morales's proposed subset of informants—women who file a police report and are targeted as a result—are not regarded by the whole of Salvadorean society as in some way "discrete." *Amaya*, 986 F.3d at 437. Her proposed group thus fails the social-distinction requirement. Devoid of particularity and adequate social distinctiveness, the group is not cognizable—and hence cannot salvage Morales's asylum claim.

7

B.

Morales's next proposed social group is *Salvadorean women who are in a domestic relationship that they are unable to leave*. Morales has not demonstrated herself even to belong to this group. In her application and testimony, Morales alleged two relevant relationships: one with her cousin and one with her ex-partner. Even if these relationships were in fact "domestic," which we need not decide, Morales has not established that she was unable to leave them. By her own admission, the relationship with her cousin ended over forty years ago, and she has not been physically harmed by him since. His more recent threats "do[] not compel the conclusion that [she] was unable to leave," as a sister circuit recently concluded in the closer case of a woman alleging threats and harassment from an estranged husband. *Alfaro v. Barr*, 790 F. App'x 91, 92 (9th Cir. 2020). As for Morales's other relationship, she recounted that the ex-partner "left" her decades ago and passed away in 2007. A.R. 63. Since Morales's proposed social group is "defined in the present tense," a relationship terminated long ago does not qualify her as a member. *Hernandez-Cabrera v. Barr*, 837 F. App'x 148, 152 (4th Cir. 2020). Morales gave no indication of any "present tense" relationship around the time of her departure from El Salvador in the fall of 2015.

In any event, for factual determinations by the IJ and Board, our review is limited to whether there was "substantial evidence" to support them. *Portillo Flores v. Garland*, 3 F.4th 615, 626 (4th Cir. 2021) (en banc). Under this standard, we are to uphold findings unless the record would compel "any reasonable adjudicator . . . to conclude to the contrary." *Id.* (internal quotation marks omitted). For the foregoing reasons, we see no

8

basis to conclude, let alone be compelled to conclude, that Morales should be classified as a woman in a domestic relationship that she is unable to leave.

C.

Morales's third and final proposed social group, *family*, also runs into trouble. Although this group is cognizable under our precedent, *see Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015), and Morales certainly belongs to a family, the inquiry does not stop there. Morales still has the remaining burden of establishing a "nexus" between family membership and past or future persecution. *Alvarez Lagos v. Barr*, 927 F.3d 236, 246 (4th Cir. 2019).

To this end, Morales argues that "family" is the only explicable reason for her alleged mistreatment at the hands of her cousin and ex-partner. These men, after all, "did not just assault and rape a random girl on the street." Pet'r Br. 25. This observation falls short, however, of showing why the supposed abuses occurred. An asylum applicant must show family membership to be "more than an incidental, tangential, superficial, or subordinate reason for . . . persecution." *Hernandez-Avalos*, 784 F.3d at 949 (internal quotation marks omitted). Morales has not pointed to any evidence of nexus besides the identities of her alleged assailants. That her cousin supposedly raped her, and not a stranger, does not mean that he did so on account of family membership. Indeed, the government rattles off a series of other plausible motives: "jealousy, possessiveness, and/or sexual desire." Resp't Br. 27. The reasons for sexual interactions, even among family members, are varied and diverse. Morales, moreover, did not point to any other persons that her supposed assailants abused on account of their status as members of her family. We cannot

9

declare that any reasonable adjudicator would—on this sparsely developed record—have arrived at a different conclusion as to nexus than the Board did.

\* \* \*

In sum, we are unable to reverse the Board's order on the basis of its treatment of Morales's proposed social groups. Because her asylum claim does not prevail, her claim for withholding of removal does not either. The agency adjudicators correctly applied law and fact in denying Morales's application, and the record before us does not compel a contrary conclusion.

### III.

Morales raises one more claim, under the U.N. Convention Against Torture (CAT), for which lacking a "particular social group" is no hindrance. According to the regulations that implement the Convention, Morales can obtain relief from a removal order if she establishes that it is "more likely than not" that she would be "tortured" in El Salvador. 8 C.F.R. §§ 1208.16(c)(2); *see Portillo Flores*, 3 F.4th at 637. Torture is defined as the infliction of "severe pain or suffering" with the "consent or acquiescence" of the foreign government or others there "in an official capacity." 1208.18(a)(1); *see Portillo Flores*, 3 F.4th at 637. Nonetheless, we cannot assess whether Morales has met her burden, since neither she nor the Board meaningfully addressed her CAT claim on the administrative appeal.

This court is not one of unlimited jurisdiction. Congress has circumscribed our authority over final orders of removal when a petitioner did not "exhaust[] all administrative remedies." 8 U.S.C. § 1252(d)(1). Morales's notice of appeal to the Board—

10

to which no briefing was added—listed only one argument concerning her claim for CAT relief: that she had, in fact, "testified credibly and consistently." A.R. 11. That contention is different from what Morales now argues: that the Salvadorean government has consented or acquiesced to her torture by "grant[ing] impunity to corrupt police, and gang members." Pet'r Br. 32. The daylight between these arguments poses a problem for Morales because "failure to dispute an issue on appeal to the B[oard] . . . bars judicial review." *Massis v. Mukasey*, 549 F.3d 631, 638 (4th Cir. 2008). Absolving Morales of the exhaustion requirement would frustrate the objectives of "promot[ing] judicial efficiency and protect[ing] the integrity of the administrative process," which this jurisdictional bar valuably serves. *Del Carmen Amaya-De Sicaran v. Barr*, 979 F.3d 210, 215 (4th Cir. 2020).

It is true that the Board did refer to her CAT claim. But this fleeting mention cannot relieve Morales of the need to fairly present her CAT claim to the Board. The Board here devoted all of two sentences to noting—without law or facts—that it "agree[d]" with the immigration judge's ruling, which Morales had not "meaningfully challenged." A.R. 3. Such cursory and conclusory treatment could not be more different from that in *Portillo Flores*, where the Board signaled its "judgment as to what it considers to be a sufficiently developed issue" by citing to multiple cases and providing factual support. 3 F.4th at 633. Because the Board rightly stated that Morales had not meaningfully presented her CAT claim, we have no jurisdiction to evaluate arguments raised for the first time on review. We thus dismiss.

IV.

For the foregoing reasons, the petition is denied in part and dismissed in part.

11

*DENIED IN PART AND DISMISSED IN PART*