# United States Court of Appeals
## For the First Circuit

No. 24-1295

SONIA PATRICIA MAYANCELA GUAMAN; JESUS ADRIAN SANTANDER-PADILLA;
J.A.S.M.; F.C.S.M.,

Petitioners,

v.

PAMELA J. BONDI, United States Attorney General,[*]

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Gelpí, Thompson, and Rikelman,

Circuit Judges.

Kevin P. MacMurray, with whom MacMurray & Associates was on brief, for petitioners.

Zachary S. Hughbanks, Trial Attorney, Office of Immigration Litigation, with whom Anthony P. Nicastro, Assistant Director, Office of Immigration Litigation, and Brian Boynton, Principal Deputy Assistant Attorney General, Civil Division, were on brief, for respondent.

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Pamela J. Bondi is automatically substituted for former Attorney General Merrick B. Garland as respondent.

April 28, 2025

**THOMPSON, Circuit Judge.** Petitioners Sonia Mayancela-Guaman ("Mayancela") and her husband, Jesus Santander-Padilla ("Santander"), are indigenous people and citizens of Ecuador. Santander immigrated to the United States without admission or parole in 2015. Mayancela likewise immigrated to the United States without being admitted or paroled. Her minor children, F.C.S.M. and J.A.S.M., accompanied her on her passage.

Being neither admitted nor paroled, the Department of Homeland Security ("DHS") charged Santander, Mayancela, J.A.S.M., and F.C.S.M. with removability pursuant to section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"). Mayancela and Santander did not dispute their removability. However, in an effort to avoid removal, Santander and Mayancela -- together with her minor children -- each applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). An immigration judge ("IJ") in the Boston Immigration Court denied those applications, and the Board of Immigration Appeals ("BIA" or "Board") affirmed the denials.[1] Mayancela and Santander now petition this court for review of the agency's decision. For reasons to follow, we grant the petition for review in part, vacate the agency's decision insofar as it denied

---

[1] When discussing the BIA and the IJ's decisions as a unit, we refer to them jointly as "the agency." See Pineda-Maldonado v. Garland, 91 F.4th 76, 80 (1st Cir. 2024).

- 3 -

Mayancela's asylum and withholding of removal claims, and remand for further proceedings consistent with this opinion.

## BACKGROUND

We will first introduce the reader to Mayancela and Santander, and then proceed to analyze the arguments in their petition to this court relative to the agency's decision on their applications for asylum, withholding of removal, and protection pursuant to the CAT. We warn that the facts underlying Mayancela and Santander's petition, which we draw from the administrative record, including petitioners' testimonies, which the IJ found credible, are quite grim. See Adeyanju v. Garland, 27 F.4th 25, 31 (1st Cir. 2022).

Mayancela grew up in an indigenous community in Chorocopte, a rural parish of Cañar, Ecuador. Mayancela was raped throughout her early teens in Chorocopte by her cousin, Edison. She was 13 years old at the time the pattern of consistent sexual violence, occurring on at least a biweekly basis, emerged. During the incidents, Edison threatened to hurt Mayancela and her family and told her that the sexual abuse of Ecuadorian women was "normal and that it was something that people did and [that she] just had to live it." Mayancela heeded Edison's threats and assertions, and she did not tell anyone what was happening to her. Edison's abuse was only revealed when Mayancela became pregnant at the age of 16 as a result of the rapes.

- 4 -

Upon discovering her daughter was being abused, Mayancela's mother immediately reported Edison's conduct to the local Ecuadorian police. However, the local police's involvement only caused Edison's aggression toward Mayancela to escalate. After becoming aware of the police report, Edison contacted Mayancela via text message and intensified his threats to hurt her and her family, now including her unborn child. "If [you] are going to play, we are going to play," Edison forewarned her. Edison then fled to Quito -- eight hours' distance from Cañar -- thus evading the attempts by local police to bring him to account for his transgressions against Mayancela.

Edison's menacing of Mayancela continued for several years after his flight to Quito, as he was never held legally accountable by Ecuadorian authority for his criminal acts against her. He eventually returned to Cañar, where he continued to harass Mayancela, her family, and her child. On one occasion, when Mayancela's child was just a few years old, Edison appeared unannounced at her family's home, where he drunkenly threatened Mayancela's mother with a knife and tried to hit her. On another, he tried, without permission, to pick up Mayancela's child from school, and on another, a woman Mayancela believed Edison directed attempted to abduct her child at a bus stop. Edison would also follow Mayancela when she went into the city, and he continued to threaten her over text messages. Mayancela explained in her

written declaration to the agency that these actions caused her to "live in fear."

To escape her persecutor, Mayancela first migrated to the United States in September 2009, around a year after the birth of her child. As she explained to the IJ, Edison "had [her] under threat and [she] just wanted to leave the country." Mayancela was detained shortly thereafter, and, following a five-month detention in an immigration detention facility, she was removed from the United States in January 2010. While Edison's depraved conduct provided Mayancela's impetus for migrating on this occasion, she did not seek relief from removal at the time, considering "[she] had to wait three more months to fight her case" and because, back in Ecuador, "[her] mom was suffering and also [her] kid."

Removed to Ecuador without a fight, Mayancela returned to live with her mom, grandmother, niece, and child in Chorocopte. During this chapter of her life in Ecuador, she met her now-husband and co-petitioner, Santander. Santander was the milkman who collected milk from the cows on her family's and other nearby farms. With Santander, she had her second child.

Six years after her return to Ecuador, Mayancela again fled to the United States in 2016, after the incident where Edison came to her family's home intoxicated and threatened her mother with a knife. Mayancela remained in the United States until October 2021, when she briefly returned to Ecuador to retrieve her

children, who had been living in the country with her mother, after the school pick-up and bus-stop encounters which she perceived as attempted kidnappings of her child coordinated by Edison. Mayancela reentered the United States with her children the following month in November 2021, and she has remained in the United States with her children since.

Like Mayancela, petitioner Santander also grew up in an indigenous community in Cañar, Ecuador. While in high school in Cañar, Santander became interested in and later involved with the Movimiento de Unidad Plurinacional Pachakutik -- Nuevo País ("Pachakutik Party"), a political party that represents the interests of indigenous Ecuadorians. Santander was drawn to the Pachakutik Party because he faced marginalization and inequality "as an indigenous," and because he believed "that [the] political party w[ould] help" indigenous persons like himself.

Santander's involvement with the Pachakutik Party included attending party gatherings and rallies, "put[ting] flyers around the city in Cañar," and participating in "protests in support of indigenous rights." At one such protest around 2014, military-garb-clad members of the then-leading political party, the Alianza Pais ("PAIS"), attacked the Pachakutik Party members present, including Santander, and hit them with metal rods. Individuals who identified themselves as members of PAIS later arrived at Santander's home and threatened to kill him if he

continued to support the Pachakutik Party. Around this same time, Santander would also receive ominous phone calls "say[ing] that [he] should not support [the Pachakutik Party] or they would hurt [him]." In view of these threats and acts of politically motivated violence, Santander sought refuge under the aegis of the local police; but the police informed him that they could not offer protection because he was "too far away," and advised it would be best for him to leave the country. Santander thus fled to the United States around July 2015.

**THE AGENCY PROCEEDINGS**

Soon after Santander arrived in the United States at or near McAllen, Texas, DHS charged him with removability as a noncitizen present in the United States without being admitted or paroled on July 24, 2015. Mayancela, F.C.S.M., and J.A.S.M. were similarly charged with removability on November 21, 2021, a few days after Mayancela reentered the United States with her children at or near San Luis, Arizona. As relief from removal, Mayancela, together with F.C.S.M and J.A.S.M. as derivative applicants, and Santander each applied for asylum, withholding of removal, and protection pursuant to the CAT.[2] In her application, Mayancela

---

[2] Mayancela's minor children stood to benefit only from her asylum application. While the INA provides for derivative asylum in 8 U.S.C. § 1158(b)(3)(A), it does not provide for derivative withholding of removal, nor does the CAT provide derivative protection.

premised her asylum and withholding of removal claims on her fear of future persecution at Edison's hands on account of her membership in the particular social groups Ecuadorian women and Ecuadorian females, while Santander premised his claims on his political opinion and his fear of future persecution based on its expression. The couple's respective CAT claims were based on a fear of future torture for principally the same identified reasons. On July 24, 2023, the IJ issued a decision denying petitioners' applications in their entirety and ordering petitioners' removal to Ecuador.

*The IJ's Decision*

Let us set down the burden petitioners faced before the IJ to succeed on their applications' claims, then we will move forward to examine the IJ's decision. To satisfy the criteria for asylum, Mayancela and Santander were faced with the burden to prove either that they (1) had suffered past persecution or (2) had a well-founded fear of future persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion.[3] Journal v. Keisler, 507 F.3d 9, 12 (1st Cir.

---

[3] Ultimately, to succeed on an asylum claim, an applicant who establishes past persecution on account of a protected ground must additionally maintain a well-founded fear of future persecution on the same basis. See Chen v. Lynch, 814 F.3d 40, 45 (1st Cir. 2016). "If the petitioner establishes past persecution, [however,] he is entitled to a presumption that his fear of future persecution is well-founded; the burden then shifts to the government to show a change in country conditions in order to rebut

2007) (citing 8 U.S.C. § 1101(a)(42)) (outlining an asylum claimant's burden); see also Lopez de Hincapie v. Gonzales, 494 F.3d 213, 217 (1st Cir. 2007) (explaining that "[t]o rise to the level of persecution, the sum of an alien's experiences must add up to more than ordinary harassment, mistreatment, or suffering"); Orelien v. Gonzales, 467 F.3d 67, 72 (1st Cir. 2006) (noting that, in the immigration context, "[p]ersecution always implies some connection to governmental action or inaction"). The burden for petitioners' withholding of removal claims was even higher, requiring proof by a "clear probability" that if returned to Ecuador they would be persecuted on account of a statutorily protected ground. See Pineda-Maldonado, 91 F.4th at 82 (quoting Sanchez-Vasquez v. Garland, 994 F.3d 40, 46 (1st Cir. 2021)). And their CAT claims required something even further: proof that they would more likely than not be tortured at the hands of the Ecuadorian government or with its consent or acquiescence should they return to the country. See De Oliveira v. Mukasey, 520 F.3d 78, 79 (1st Cir. 2008); see also Samayoa Cabrera v. Barr, 939 F.3d 379, 382 (1st Cir. 2019) (defining "torture" for the purpose of evaluating a CAT claim).

Burdens in place, we now briefly explain how the IJ reached his decision resolving petitioners' claims. Considering

that presumption." Decky v. Holder, 587 F.3d 104, 110 (1st Cir. 2009) (emphasis added).

- 10 -

Mayancela and Santander's claims for asylum, withholding of removal, and protection pursuant to the CAT, the IJ found, as a preliminary matter, that both Mayancela and Santander testified credibly. The IJ also determined that there were no statutory bars with respect to Mayancela's application. With respect to Santander's application, however, the IJ found that it was filed after the one-year statutory deadline for asylum claims, and, moreover, that there were no extraordinary or changed circumstances warranting an exception for a late filing. See Pan v. Gonzales, 489 F.3d 80, 84 n.3 (1st Cir. 2007) ("An asylum application filed beyond th[e] one-year window may nonetheless be considered if the alien can show changed or extraordinary circumstances."). The IJ nevertheless proceeded to address the merits of Santander's asylum claim considering its overlap with his timely claim for withholding of removal. See Decky, 587 F.3d at 109 (explaining that when a petitioner brings claims for both withholding of removal and asylum, we usually focus on the petitioner's asylum claim).

Beginning with Mayancela's asylum application, the IJ found that the abuse Mayancela endured in Ecuador at Edison's hands "clearly establishe[d] the requisite harm" to constitute past persecution. The IJ also found that the particular social groups allegedly motivating Edison, "Ecuadorian women" and "Ecuadorian females," were "legally cognizable." See Sanchez v. Garland, 74

- 11 -

F.4th 1, 6 (1st Cir. 2023) (outlining "the test this circuit has accepted for identifying a particular social group"). That said, the IJ nevertheless concluded that Mayancela did not meet her burden to show that the persecution she experienced was "on account of" her membership in either social group. See Hincapie, 494 F.3d at 217 ("Another element of an asylum claim based on persecution involves the nexus requirement, that is, whether the harm, if otherwise sufficient, has occurred (or is anticipated to occur) 'on account of' one of the five statutorily protected grounds."). The IJ instead concluded that Mayancela was persecuted solely because her cousin "was a violent individual" who "was using drugs," and who "was also drunk at the time" of the incidents of sexual abuse.

Turning to the prospect of future persecution, the IJ determined that Mayancela did not have an independent well-founded fear she would be persecuted on account of a protected ground should she return to Ecuador. In support of that conclusion, the IJ noted Mayancela had twice before entered the United States without applying for asylum, pointed out that Mayancela had voluntarily returned to Ecuador in 2021 despite her cousin's presence there, emphasized that her cousin "ha[d] not abused her in approximately 17 years and ha[d] not had any contact with her in approximately seven," and resolved therefore that no objective well-founded fear of future persecution laid. See Keisler, 507

- 12 -

F.3d at 12 (explaining that to determine whether an applicant has established "a well-founded fear of future persecution," absent the benefit of the rebuttable presumption, "we apply a two-part test entailing both subjective and objective elements"). Mayancela's asylum application was therefore denied, along with her application for withholding of removal, considering that claim's higher burden. See Amouri v. Holder, 572 F.3d 29, 35 (1st Cir. 2009) ("When an alien fails to establish a well-founded fear of persecution sufficient to ground an asylum claim, a counterpart claim for withholding of removal (that is, a claim premised on essentially the same facts) necessarily fails."). The IJ also denied Mayancela's application for protection pursuant to the CAT. He emphasized that the local Ecuadorian police attempted to locate Edison by telephone and by mail when Edison's criminal conduct was first reported, and he concluded, therefore, that Mayancela failed to show she would more likely than not be tortured at the hands of the government or with its consent or acquiescence should she return to Ecuador. See De Oliveira, 520 F.3d at 79.

Moving to Santander, the IJ concluded that Santander was a victim of past persecution on account of a protected ground -- his political opinion -- concentrating on the incident around 2014 where Santander was physically attacked and hit with metal objects by military-garb-clad members of PAIS while participating in political protest as a member of the Pachakutik

- 13 -

Party.  See Hincapie, 494 F.3d at 217.  The IJ also highlighted as support for his past-persecution determination that Santander's pleas for protection to the local police after the incident were rebuffed, concluding that that evidence supported a government nexus.  See Orelien, 467 F.3d at 72; Medina-Suguilanda v. Garland, 121 F.4th 316, 322 (1st Cir. 2024) ("Serious abuse inflicted by a private actor based on a protected ground is not itself sufficient to establish past persecution.  For abusive, discriminatory treatment to suffice, it must also have a government nexus.").

Typically, when an asylum applicant establishes past persecution, as Santander did here, the applicant is entitled to the presumption that their fear of future persecution on that same ground is well-founded.  See Decky, 587 F.3d at 110; see also Rashad v. Mukasey, 554 F.3d 1, 5 (1st Cir. 2009) (explaining that the same rebuttable presumption also applies to withholding of removal claims).  However, in this case, the IJ determined Santander was not entitled to any such presumption considering his untimely application.  Nevertheless, because Santander met the usual burden to show past persecution, and considering the overlap between his untimely asylum claim and his timely claim for withholding of removal, the IJ chose to advance and consider whether the government met a hypothetical burden to show by a preponderance of the evidence that there had been a fundamental change in Ecuador's conditions negating Santander's fear.  See

Mendez v. Garland, 67 F.4th 474, 481 (1st Cir. 2023). And the IJ determined that the government had satisfied that rubric.

In support of its conclusion that the government had established a fundamental change in circumstances rebutting Santander's particular fear of future persecution on account of his membership in the Pachakutik Party, the IJ identified evidence submitted by the government indicating that Ecuador's president at the time Santander was persecuted, President Rafael Correa, had been voted out of office and yielded power peacefully, as well as testimony from Santander himself explaining that the then-current mayor of his hometown was a member of the Pachakutik party and his old coworker. Because that evidence rebutted Santander's particular fear of future persecution in the IJ's view, Santander's claim for asylum, along with his claim for withholding of removal, was denied. Santander's claim for protection pursuant to the CAT was likewise denied; the IJ, considering primarily the same evidence, concluded that Santander had not shown the requisite likelihood he would be tortured upon return to Ecuador at the hands of the government or with its consent or acquiescence.

*The BIA's Decision*

Following petitioners' appeal, the BIA, the body responsible for reviewing the IJ's decision, adopted and affirmed the IJ's decision while adding its own gloss. Considering Mayancela's asylum application, the Board recognized that

- 15 -

Mayancela's membership in the social groups "Ecuadorian women" and "Ecuadorian females" may have made her more "susceptible" to Edison's depraved conduct, which it agreed arose to the level of persecution. But the Board opined Mayancela's heightened vulnerability, alone, was not sufficient to establish that the persecution she endured was "on account of" her group membership, citing Matter of M-E-V-G-, 26 I. & N. Dec. 227, 250-51 (BIA 2014) ("[C]ertain segments of a population may be more susceptible to one type of criminal activity than another . . . but not all societal problems are bases for asylum."). According to the BIA, "[Mayancela's] observation that she is a woman and that her cousin did not rape males . . . [therefore] f[e]ll[] short of establishing that her gender was one central reason for the abuse."

In its consideration of the evidence directly addressing Edison's motivations and not simply Mayancela's vulnerabilities, the BIA reasoned that the central question around which Mayancela's asylum claim revolved -- what motivated Edison to harm her? -- was a question of fact subject to the Board's clear error review. And the Board concluded under that rubric that "the Immigration Judge did not clearly err in finding that the evidence [did] not establish that any past or feared harm was or would be on account of a protected ground." "[R]ather," the BIA resolved, the IJ appropriately determined "[Mayancela's] past and/or feared harm relate[d] solely to criminal activity by a cousin who was violent

- 16 -

and sexually abused [her] because he was using drugs and/or drunk." The BIA thus affirmed the IJ's denial of Mayancela's asylum and withholding of removal claims on the ground that Mayancela failed to show that "her status as an Ecuadorian Woman and Ecuadorian Female was one central reason for the harm."[4]  The BIA likewise affirmed the IJ's denial of Mayancela's application for protection under the CAT, finding that the IJ did not clearly err in forecasting the unlikelihood that Mayancela would be tortured with government consent or acquiescence if removed to Ecuador.

Moving to Santander's claims, the BIA, at the timeliness threshold, declined to resolve whether Santander had shown extraordinary or changed circumstances meriting consideration of his untimely asylum application and therefore entitling him to the presumption that his fear of future persecution was well-founded. The BIA reasoned that resolving the timeliness issue was not necessary because whether Santander's application was timely or not, the application failed, citing Palma-Mazariegos v. Gonzales,

---

[4] The Board also indicated that Mayancela's claim failed because she failed to show "that the harm was intended to overcome or based on animus towards [Ecuadorian women or Ecuadorian females] generally," citing Matter of M-R-M-S-, 28 I. & N. Dec. 757, 760 (BIA 2023), and Morales v. Garland, 51 F.4th 553, 559 (4th Cir. 2022).  However, as we later discuss in further detail, see infra note 8, Mayancela was not required to establish that Edison possessed "animus" towards her proposed social groups to succeed on her asylum claim.  See Pineda-Maldonado, 91 F.4th at 89 ("The asylum statute does not say anything to suggest that 'animus' toward a particular social group is required for an applicant to be eligible for asylum, as it uses the phrase 'on account of.'").

428 F.3d 30, 35 (1st Cir. 2005) (declining to determine if the presumption of a well-founded fear of persecution applied because "even if we were to assume, for argument's sake, that the petitioner is . . . afford[ed] . . . the benefit of the ensuing presumption, we still would conclude that the government has provided enough evidence both to rebut the presumption and to show that there is no sufficient likelihood that the petitioner will face persecution should he be returned"). That was so because, according to the BIA, whether Santander was entitled to the presumption of a well-founded fear of future persecution, the IJ appropriately concluded that the government established a fundamental change in Ecuador's circumstances sufficient to rebut that presumption. See id. The IJ's decision to deny Santander asylum and withholding of removal was therefore affirmed on that ground, as was the IJ's decision to deny Santander CAT protection considering primarily the same country-condition evidence.

## THE PETITION

Mayancela and Santander now petition this court for review of the agency's decision. Their petition raises several arguments. Concerning Mayancela, the petition asserts that the agency erred when it held that she failed to establish the requisite nexus between the past persecution she suffered at Edison's hands and her membership in the particular social groups Ecuadorian women and Ecuadorian females, and when it determined

that she did not otherwise establish an independent well-founded fear of future persecution on account of a protected ground. As for Santander, the petition asseverates that the agency erred when it held that the government established by a preponderance of the evidence a fundamental change in Ecuador's circumstances rebutting any presumption of a well-founded fear of future persecution on account of his political opinion that could be afforded to him. And lastly, respecting the couple, the petition argues that the agency erred in holding that Mayancela and Santander did not establish eligibility for protection under the CAT. We will outline the relevant standard of review and then address petitioners' arguments.

"We usually review decisions of the BIA, not the IJ." Ordonez-Quino v. Holder, 760 F.3d 80, 87 (1st Cir. 2014). However, "when the BIA affirms the immigration judge's holdings but adds its own analysis -- as it did here -- we review both decisions as a unit." Lee v. Barr, 975 F.3d 69, 73 (1st Cir. 2020). In conducting that review, we uphold the agency's factfinding so long as it is supported by substantial evidence in the record. Topalli v. Gonzales, 417 F.3d 128, 131 (1st Cir. 2005). "Questions of law, of course, are reviewed de novo." Vasili v. Holder, 732 F.3d 83, 89 (1st Cir. 2013). But, barring an error of law, we reverse "only if the record is such as to compel a reasonable factfinder

to reach a contrary determination." Chhay v. Mukasey, 540 F.3d 1, 5 (1st Cir. 2008).

*Mayancela's Claims*

We begin with petitioners' arguments relative to Mayancela's claims. The gravamen of petitioners' argument regarding Mayancela targets the agency's determination that Edison's motivation to persecute her derived "solely" from his generally violent disposition together with alcohol and drug use. Petitioners maintain that the agency committed legal error when reaching that conclusion by failing to engage the appropriate mixed-motivation nexus analysis. They contend that the agency was required, according to the immigration statute and this court's precedents, to consider whether Mayancela's membership in the social groups Ecuadorian women and Ecuadorian females was "at least one central reason" motivating her persecutor, and they assert that the agency failed to adequately analyze the question. See 8 U.S.C. § 1158(b)(1)(B)(i) ("To establish that the applicant is a refugee within the meaning of such section, the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant."). The government, for its part, does not dispute that a mixed-motivation analysis was required, but it avers without much elucidation that the agency "explicitly" conducted the "at least one central reason"

test.  Upon our independent review of the record bearing on the issue, the court agrees with petitioners that the agency failed to appropriately conduct the required mixed-motivation nexus analysis of Mayancela's asylum claim, for reasons we will now explain.

This court has consistently emphasized that the IJ and the BIA are required by the immigration statute to utilize a "one central reason," mixed-motivation analysis when considering asylum claims that potentially present mixed motivations.  See Espinoza-Ochoa v. Garland, 89 F.4th 222, 236 (1st Cir. 2023); Enamorado-Rodriguez v. Barr, 941 F.3d 589, 596 (1st Cir. 2019). "Thus, just because the agency finds that persecutors were motivated by a non-protected ground does not end the inquiry." Espinoza-Ochoa, 89 F.4th at 235-36.  The agency must look further and determine whether the asserted protected ground nevertheless remains a central reason motivating the persecution by inquiring whether the protected ground is "incidental, tangential, superficial, or subordinate to another reason for [the] harm." Singh v. Mukasey, 543 F.3d 1, 5 (1st Cir. 2008).

Here, the IJ and the BIA failed to meet their statutory obligation.  Let's start with the IJ's decision.[5]  Critically,

---

[5] Notably, the words "mixed motive" and "one central reason" did not appear in the IJ's analysis at all.  See Espinoza-Ochoa, 89 F.4th at 236 (noting as support for the court's finding error that "the words 'mixed motive' and 'one central reason' d[id] not appear at all in the decisions below").

"[n]othing in the IJ's ruling reads that the IJ utilized a mixed-motive or 'at least one central reason' analysis, as the statute requires." Enamorado-Rodriguez, 941 F.3d at 596. The government points to the IJ's conclusion that Edison "was not motivated because [Mayancela] was an Ecuadorian woman or female," as its illustration indicating that the mixed-motivation analysis was "explicitly" and appropriately conducted. However, while the IJ did conclude as much, the issue is that the IJ did not engage with the evidence he had earlier found credible supporting the opposite conclusion in reaching his decision. See id. (finding error in the agency's nexus analysis when it failed to "explain how" petitioner's protected social group was not at least one central reason for his persecution in light of "[petitioner's] uncontested testimony, deemed credible by the IJ," which supported the contrary conclusion); Espinoza-Ochoa, 89 F.4th at 237 (finding error in the agency's nexus analysis when it failed to adequately examine "findings and other record evidence [which] could support a finding that" petitioner was persecuted on account of his proposed protected social group); see also Precetaj v. Holder, 649 F.3d 72, 76 (1st Cir. 2011) (remanding to the agency to revisit its past persecution assessment where the agency failed to probe certain record evidence and where "[i]f there [was] a reason for discounting or ignoring the[] [evidence], it [was] not explained in [the agency's] decision"). Nor did the IJ's ruling explain how

Mayancela's sex and gender were incidental, tangential, superficial, or subordinate to Edison's motivations deriving from his violent disposition, drug use, or alcohol. See Singh, 543 F.3d at 5. In place of that sort of analysis, the IJ instead merely pointed to testimony where Mayancela opined that Edison may have been motivated to persecute her because he was a violent person who used drugs and alcohol and concluded therefore that Edison persecuted Mayancela "solely" for those reasons. The government contends that the noted testimony by Mayancela "alone easily s[upported]" the agency's decision, but we will tell why the government is mistaken. Such dispositive reliance on certain isolated moments in Mayancela's testimony as was practiced by the IJ here was, as we will show, sorely misplaced; as Mayancela's statements on Edison's substance abuse and his violent disposition did not divest the agency of its obligation to conduct the statutorily mandated "one central reason" analysis considering her proposed protected grounds. See Espinoza-Ochoa, 89 F.4th at 236 (quoting Enamorado-Rodriguez, 941 F.3d at 596-97) ("'Even on its own terms,' the agency's conclusion that [the petitioner's] persecution was motivated by [a non-protected ground] [did] not itself exclude' the possibility that [a protected ground] was 'at least one of the central reasons' for his persecution.").

This circuit's precedent actively anticipates that asylum applicants will be unable to precisely demonstrate their

persecutor's exact motivations, and, as such, and in line with the immigration statute's "one central reason" mandate, "[w]e do not require an asylum applicant to demonstrate that [s]he was singled out only due to h[er] protected trait." Ordonez-Quino, 760 F.3d at 90. Testimony identifying a non-protected motivation animating an asylum applicant's persecutor is therefore insufficient in and of itself to defeat an asylum claim. See id.; Espinoza-Ochoa, 89 F.4th at 235-36. That principle applies with particular force when, as here, an asylum applicant was persecuted during childhood, as "[r]arely will an applicant know the 'exact motivation' of h[er] persecutors -- especially when [s]he was victimized as a young child -- and, 'of course, persecutors may often have more than one motivation.'" Ordonez-Quino, 760 F.3d at 90 (quoting Ivanov v. Holder, 736 F.3d 5, 15 (1st Cir. 2013)).

The IJ's reasoning in this case clashes harshly against that legal backdrop. Mayancela presented voluminous evidence that Edison was motivated to harm her because of her membership in the social groups Ecuadorian women and Ecuadorian females, including, inter alia, testimony that Edison was sexually abusing her and that "[Edison] would say . . . [sexual abuse] was normal and that it was something that people did, and [she] just had to live with it," along with declarations from several experts speaking to the supposed norm in Ecuadorian society that "male control extends . . . to a woman's body," together with data from the UN

illuminating the high incidence of gender-based violence in Ecuador.  We do not comment on the compellingness or lack thereof of the evidence presented, because the issue at hand -- the IJ's failure to apply the appropriate standard when determining whether the evidence established a nexus to a protected ground -- is a question of law.  See Espinoza-Ochoa, 89 F.4th at 235-36.  But we note the evidence to illustrate that Mayancela's testimony about Edison's substance abuse and violent disposition did not "foreclose[] the possibility of a protected ground," Aldana-Ramos v. Holder, 757 F.3d 9, 18 (1st Cir. 2014), as amended (Aug. 8, 2014), meaning the mixed-motivation test remained the appropriate analysis, id.  So, to put this all briefly, when the IJ simply highlighted a portion of Mayancela's testimony offering a non-protected motivation underlying the persecution she suffered and ended his nexus inquiry there without more explanation, he committed legal error.  See Enamorado-Rodriguez, 941 F.3d at 596; Espinoza-Ochoa, 89 F.4th at 235-37.

The BIA, on appeal to it, was tasked with reviewing the IJ's factual conclusions for clear error.  8 C.F.R. § 1003.1(d)(3)(i).  But the BIA was obligated to review questions of law, discretion, judgment, and all other issues on appeal from the decision of the IJ de novo, "including the ultimate conclusion of whether the facts identified by the IJ [were] sufficient to

satisfy the legal requirements of nexus."[6] Ferreira, 97 F.4th at 45 (1st Cir. 2024) (citing Matter of S-E-G-, 24 I. & N. Dec. 579, 588 n.5 (BIA 2008)); see 8 C.F.R. § 1003.1(d)(3)(ii) (providing the scope of BIA review). Here, however, the BIA did not apply de novo review to the IJ's ultimate nexus determination, nor did it recognize or correct the IJ's failure to conduct the appropriate mixed-motivation nexus analysis in reaching its decision. Although the BIA did briefly acknowledge the required mixed-motivation test in its own opinion scrutinizing the IJ's holdings -- stating that "even under a mixed-motives analysis," Mayancela did not establish the requisite nexus -- the Board did not excavate the record relevant to the issue or elaborate on the IJ's nexus analysis when doing so. See Khalil v. Garland, 97 F.4th 54, 63 (1st Cir. 2024) ("To be sure, it is not enough for the agency simply to invoke the 'one central reason' standard in its

---

[6] While the government advances that "substantial evidence" is the appropriate standard applied by this court in reviewing the agency's ultimate nexus conclusion, the government does not comment on the appropriate standard of review the BIA should apply to the IJ's ultimate nexus conclusion, which is the relevant question occasioned by this case. Petitioners, for their part, aver that the appropriate standard of BIA review of the IJ's nexus conclusion is de novo, citing Ferreira v. Garland, 97 F.4th 36 (1st Cir. 2024). See id. at 46 n.4 ("[T]he agency's nexus conclusion . . . involves factual determinations by the IJ but a de novo review by the BIA as to whether those facts taken together are sufficient to meet the legal standard."). The standard advanced by petitioners is in accord with this court's case law, id., and, without any argument to the contrary, we will assume that it was the appropriate standard for the BIA to apply in its review of the IJ's ultimate nexus conclusion in this case.

nexus analysis while simultaneously reasoning that the persecution cannot be motivated by a protected ground simply because a non-protected ground for the persecution also exists."). Instead, the BIA continued to rely on the IJ's reasoning identifying a non-protected motivation and ending its inquiry there, because the BIA determined the IJ's nexus conclusion was not "clear[ly] erro[neous]."[7] On this record, because the possibility of a mixed motivation was not foreclosed, the BIA's reliance in this way on the IJ's inadequate nexus analysis without further scrutiny or explanation was inappropriate.[8] See Khalil, 97 F.4th at 63. We

_____

[7] Mayancela argues that the BIA's application of the clear error standard to the IJ's ultimate nexus conclusion was an independent legal error warranting vacatur and remand to the agency to reconsider its nexus decision. See Adeyanju, 27 F.4th at 44–45 (stating that application of the wrong standard of review is an error of law). We pass on deciding whether application of the clear error standard warranted vacatur and remand here, but we note that the agency should apply the de novo standard of review to the IJ's nexus conclusion if the occasion arises on remand.

[8] In addition to failing to appropriately address or analyze the IJ's inadequate mixed-motivation analysis, the BIA, as petitioners point out, also introduced error into the case when it relied on inapposite agency and out-of-circuit precedent asserting that to establish the requisite nexus, Mayancela was required to show the harm she suffered "was intended to overcome or [was] based on animus towards" Ecuadorian women or Ecuadorian females generally. See Matter of M-R-M-S-, 28 I. & N. Dec. at 760 (discussing the requirements to prove nexus in an asylum claim based on family membership); see also Morales, 51 F.4th at 559 (same). Unlike Mayancela's asylum claim, however, Morales and Matter of M-R-M-S- had to do with asylum claims based on family membership. See Morales, 51 F.4th at 558–59; Matter of M-R-M-S-, 28 I. & N. Dec. at 760. Moreover, and more significant, the nexus standard expressed in those cases requiring proof of "animus" has been definitively rejected by this circuit since the agency's decision. Pineda-Maldonado, 91 F.4th at 89. That said, we decline

therefore grant in part petitioners' petition for review, vacate the agency's decision as to Mayancela's asylum claim, and remand to the agency to conduct the appropriate mixed-motivation analysis of her claim consistent with this opinion.[9]  See, e.g., id. at 59. In addition, because the agency denied Mayancela's claim for withholding of removal on the ground that her asylum claim, which presented a lower burden, was denied, and because the agency provided no other explanation that could suffice to sustain its withholding of removal denial, we also vacate the agency's decision as to Mayancela's withholding of removal claim and instruct the agency to reconsider the claim on remand.  See Pineda-Maldonado, 91 F.4th at 90.

---

to determine whether the BIA's reference to an animus requirement was an error meriting reversal -- but we note that the agency should not require a showing of "animus" as an element of Mayancela's asylum claim when considering the claim on remand.

[9] In addition to her argument that the agency erred in failing to conduct the required mixed-motivation nexus analysis, Mayancela argues that the record compelled a finding that her membership in the social groups Ecuadorian women and Ecuadorian females was one central reason she was persecuted.  We decline to address that argument, as the agency will have an opportunity to reconsider Mayancela's asylum claim under the appropriate standard and resolve the question on review.  We also decline to address Mayancela's argument that the record compelled a finding that she possessed a well-founded fear of future persecution, as the agency's contrary finding was also affected by its nexus conclusion which it will reconsider on remand.

We move to address petitioners' arguments relative to Santander's claims. Petitioners argue that the agency erred when it determined that although Santander had presented evidence sufficient to prove past persecution, the government showed by a preponderance of the evidence that there was a fundamental change in Ecuador's conditions rebutting any presumed well-founded fear of future persecution to which Santander may have been entitled.[10] Petitioners assert that the record compelled a contrary finding. They also say that even if the presumption of a well-founded fear of future persecution was rebutted, the record nonetheless compelled the conclusion that Santander established an independent well-founded fear of future persecution sufficient to support his

---

[10] Santander does not address the timeliness of his asylum application, nor does the government. Recall, the IJ found that Santander's application was filed after the one-year statutory bar and that no extraordinary or changed circumstances merited its consideration, which would be dispositive of his asylum claim typically. See 8 U.S.C. § 1158(a)(2)(B). However, unusually, while the BIA here did adopt and affirm the IJ's decision, it expressly declined to resolve the timeliness question in doing so, reasoning that Santander's asylum application failed whether timely or not. See Esteban-Garcia v. Garland, 94 F.4th 186, 190–91 (1st Cir. 2024) (quoting López-Pérez v. Garland, 26 F.4th 104, 110 (1st Cir. 2022) (explaining that this court reviews "the IJ's decision to the extent of the adoption, and the BIA's decision as to [any] additional ground")); Tillery v. Lynch, 821 F.3d 182, 185 (1st Cir. 2016) (explaining that when "the BIA rest[s] its decision on an alternative basis . . . it is the BIA's opinion that serves as the final agency decision under review before [this court]"). As such, considering this case as it comes before us, we too decline to comment on the timeliness of Santander's asylum application, and we proceed on the path the agency trod.

asylum claim. The government counters, saying the evidence the agency relied on -- namely that PAIS was no longer controlling Ecuador's presidency at the time of the agency's decision and that Santander's former coworker and Pachakutik Party colleague was the then-mayor of his hometown, Cañar -- was sufficient to rebut the presumption as well as to establish that Santander's independent fear of future persecution was not well-founded. We will first address the arguments relative to the presumption, and then discuss the arguments relative to Santander's supposed independent showing of a well-founded fear.

But first, let us explain what it takes to rebut the presumption of a well-founded fear of future persecution before addressing Santander's argument that the government failed to satisfy the criteria. The relevant immigration regulation provides that "the government may rebut the presumption [of a well-founded fear of future persecution] with a showing of a fundamental change in circumstances in the country [to which petitioner will be removed] or the opportunity to relocate safely within [that country]." Precetaj, 649 F.3d at 75 (citing 8 C.F.R. § 1208.13(b)(1)(i)). "Where the presumption is rebutted, then absent other evidence from the applicant, asylum must be denied." Id. To successfully establish a fundamental change in circumstances in a country sufficient to rebut the presumption of a well-founded fear of future persecution, this court has explained

that "abstract evidence of generalized changes in country conditions, without more, cannot [suffice]." Palma-Mazariegos, 428 F.3d at 35. Rather, we have emphasized that "to be effective, evidence of changed country conditions must negate a petitioner's particular fear." Id. (citing Quevedo v. Ashcroft, 336 F.3d 39, 44 (1st Cir. 2003)). As such, an assessment of the adequacy of rebuttal evidence "require[s] [an] individualized analysis" examining whether the identified changes in country conditions negated the asylum applicant's showing of "specific personal danger." Quevedo, 336 F.3d at 44. We review the agency's decision on that score under the deferential substantial evidence standard of review. Mendez, 67 F.4th at 482.

Let's begin with petitioners' argument about the sufficiency of the government's rebuttal evidence. The fundamental changes in Ecuador's political conditions identified by the government and relied upon by the agency showing a fundamental change in circumstances in Ecuador were related to shifts in political authority after elections on the national level and locally in Santander's hometown of Cañar. Petitioners argue that the agency erred in its reliance on those electoral shifts in political power because the identified changes in government "alone [did] not render [Pachakutik party members] safe from persecution," and they say that other evidence in the record compelled a contrary conclusion.

Petitioners' notion that changes in political authority on the national and local levels do not independently suffice to rebut a presumptively well-founded fear of future political persecution has some support in our case law, see, e.g., Mendez, 67 F.4th at 483, but it does not align with the record in this case. Here, the agency plainly considered more than just shifts in national and local political appointments in its determination that circumstances in Ecuador had fundamentally changed since Santander suffered persecution for his support of the Pachakutik Party. See Uruci v. Holder, 558 F.3d 14, 19 (1st Cir. 2009) (rejecting the argument that the agency erred in its reliance on a national shift in power when "[t]he Parliamentary elections were but one piece of evidence considered in the aggregate"). While the agency did emphasize the evidence demonstrating President Correa, the president of Ecuador and leader of PAIS at the time Santander was persecuted, "was subsequently voted out of office and left Ecuador in 2015," along with evidence that PAIS thereafter lost power over the national government in 2021 after elections which "were deemed free and fair," and evidence that a member of the Pachakutik Party subsequently won the Cañar mayoralty in 2023 -- the agency also clearly considered additional evidence looking beyond elections. Indeed, the agency expressly noted in its decision its awareness of "the First Circuit case law which stands for the proposition that a change in political party at the

national government is insufficient alone to constitute a fundamental change in circumstances," and it thereafter pointed in addition to evidence submitted by the government showing that "members of . . . the Pachakutik party" did not face persecution as a result of the 2021 national elections where PAIS lost power, as well as evidence indicating that Pachakutik Party members were not facing violence on a local level in Cañar, where Santander's coworker and Pachakutik Party colleague had won the mayoralty. So, the straightforward response to petitioners' argument is: The agency did not rely solely on changes in political office to conclude the government showed by a preponderance of the evidence a fundamental change in Ecuador's conditions, but rather appropriately considered those shifts together with other probative evidence in the record to reach its conclusion which was "supported by reasonable, substantial, and probative evidence on the record considered as a whole." See INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)); see also Uruci, 558 F.3d at 19.

After attacking the evidence the agency relied on in determining that Santander's presumption of a well-founded fear of future persecution had been rebutted, petitioners point to some evidence that the agency declined to address, evidence which they believe compelled a contrary conclusion that Ecuador's conditions had not fundamentally changed. However, petitioners fail to reveal

any evidence so compelling as to authorize this court to disturb the agency's determination that the relied-upon changes in political conditions on both the local and national level bearing directly on the past persecution Santander suffered, together with the other evidence in the record, sufficed to prove the government's burden. What petitioners point to as compelling evidence -- reports that "[i]n 2019, Indigenous political protestors faced violent crackdowns by the government during protests," and other evidence showing that "multiple human rights organizations [subsequently] found that the government committed human rights violations in response to the 2019 protests" -- simply does not compel a contrary conclusion to that reached by the agency. Concerning as the identified 2019 protest incidents may be, the events took place before the events which the agency relied on as establishing a fundamental change in circumstances in Ecuador: PAIS losing power in 2021 and a Pachakutik party member winning the Cañar mayoralty in 2022. See Uruci, 558 F.3d at 21 (noting that evidence speaking to country conditions at a point prior-in-time to the identified fundamental changes in circumstances has limited probative value). And, to the extent that petitioners rely on evidence relating to protests and political violence in Ecuador in June 2022, after PAIS lost power, they do not illustrate why that evidence of generalized political violence compelled the conclusion that conditions in

Ecuador had not changed such that Santander's particular fear of being persecuted for his membership in the Pachakutik Party or of being harmed by a member of PAIS was no longer well-founded. See Tota v. Gonzales, 457 F.3d 161, 166 (1st Cir. 2006) (emphasizing that the fundamental changes we focus on are those bearing on "the specific circumstances that form the basis of a petitioner's presumptive fear of future persecution"). We, therefore, based on the record before us, affirm the agency's conclusion that the government established a fundamental change in circumstances in Ecuador rebutting any presumption to which Santander may have been afforded. See id.

As for petitioners' argument that Santander possessed an independent, well-founded fear of future persecution which the record compelled the agency to recognize notwithstanding the presumption, the ground petitioners offer sustaining that argument collapses. Santander testified explicitly that his independent fear of future persecution was that Rafael Correa may win a future election and that PAIS would thereafter return to power in Ecuador, so that is the fear of future persecution that we focus on. See Quevedo, 336 F.3d at 44. And, in our consideration of that narrow fear, we find no evidence in the record compelling the conclusion that Santander's fear of Correa's return was objectively reasonable as his claim required. See Keisler, 507 F.3d at 12. Petitioners point to absolutely nothing indicating that there is

any likelihood Rafael Correa or PAIS will return to power in Ecuador, either on a national basis or locally in Santander's hometown of Cañar. Petitioners' failure to produce such evidence in the face of the evidence submitted by the government, which depicted Correa and PAIS's fall from power, was fatal to their averment that the record compelled their preferred factual inference that Correa and PAIS will rise again. See id. at 13 (holding that the record did not compel the conclusion that a petitioner's fear of future persecution was objectively and subjectively reasonable when the petitioner failed to "provide[] an explanation for his continued fears").

Putting it all together, because the record did not compel the conclusion that circumstances in Ecuador had not fundamentally changed, and because the record did not compel the conclusion that Santander established an independent well-founded fear of future persecution either, we affirm the agency's decision denying Santander's asylum claim, and, therefore, we affirm the denial of his claim for withholding of removal alongside. See Decky, 587 F.3d at 109.

*The CAT Claims*

Lastly, the couple's contention that the record compelled the conclusion that they were entitled to protection pursuant to the CAT. As before, we will outline the relevant law and then address petitioners' arguments tracing the assertion.

Recall, the standard for CAT relief is generally more challenging to meet than the standard for asylum. See De Oliveira, 520 F.3d at 79; see also Romilus v. Ashcroft, 385 F.3d 1, 8 (1st Cir. 2004). To qualify for CAT protection, applicants bear the burden of demonstrating that conduct rising to the level of torture would more likely than not befall them, at the hands of the government, or with its consent or its acquiescence, should they be removed to their home country. Romilus, 385 F.3d at 8. The threshold which a CAT applicant is required to reach to demonstrate that the anticipated torture is sufficiently likely to occur -- more likely than not -- is markedly higher than the minimum probability of future persecution which an asylum claim requires. Id.; see also INS v. Cardoza-Fonseca, 480 U.S. 421, 440 (1987) (explaining that as little as a 10% risk of the occurrence of persecution might support a well-founded fear of future persecution sufficient to establish an asylum claim). In contrast, however, unlike an applicant for asylum, a CAT claimant need not establish a nexus between the torture anticipated upon removal and a protected ground to succeed. Romilus, 385 F.3d at 8.

Here, in its proceedings, the agency, considering the record before it, determined that petitioners failed to establish the requisite likelihood that they would be tortured with the government's consent or its acquiescence should they be removed to Ecuador. We review the agency's determination regarding the

probability of such conduct's occurrence for substantial evidence. See Cabrera v. Garland, 100 F.4th 312, 325 (1st Cir. 2024); see also Bazile v. Garland, 76 F.4th 5, 14 (1st Cir. 2023) (explaining that "[f]or purposes of the substantial evidence test, predictive findings as to what may or may not transpire at a future date are regarded as findings of fact").

As the reader may remember, Mayancela told the agency that she would face torture at Edison's hands should she be removed to Ecuador. The agency did not comment on whether Edison's anticipated misconduct rose to the level of torture; it denied Mayancela's CAT claim on the ground that she failed to present sufficient evidence showing a likelihood that any torture inflicted by Edison would occur with the government's consent or its acquiescence. The agency noted as support for its conclusion that after Mayancela reported Edison to the local police, the police "attempted to locate [him] by sending letters and call[ing] him." Santander, for his share, told the agency that he would be tortured if removed to Ecuador, by who he did not say, on account of his political beliefs. In response to that assertion, the agency emphasized that "President Co[r]rea [was] no longer in power, and [that] the [then-]current mayor of [Santander's] hometown [was] from [Santander's] own political party," and it reasoned therefore that "there [was] insufficient evidence that

were he to return, the government officials or someone acting on their behalf would acquiesce to [his] torture."

As we turn now to petitioners' part before us, we stress that petitioners missed their occasion to shine a light on any evidence or law contradicting the agency's identified evidence or its related conclusions.  At the moment in their petition that called for reasoned, targeted argumentation challenging the agency's finding it unlikely they would be tortured with state acquiescence should they be removed to Ecuador, petitioners chose instead to perfunctorily point to their earlier asylum arguments about Ecuador's country conditions, to aver that, considering those arguments, the "record supported a finding that the Government of Ecuador is unwilling and unable to control politically motivated violence, and gender-based violence," and to argue further that, in light of said supposedly compelled finding, the record compelled a conclusion "contrary to the holdings of the Board and Immigration Judge, [that] any future torture would occur at the acquiescence of the Ecuadorian authorities."  On its face, the analysis petitioners present may appear lacking in that it does not illustrate why the record compelled the conclusion that future conduct rising to the level of torture would more likely than not occur in the first instance.  Cf. Cabrera, 100 F.4th at 325 ("Indeed, we have cautioned repeatedly that generalized country conditions evidence (by itself) is not sufficient for a

grant of CAT protection."). But we need not address the analysis' merits here. That is so because, when petitioners attempted to piggyback on their asylum arguments to avoid the required meaningful examination of the distinct elements of their independent CAT claims, that "amount[ed] to waiver, plain and simple." See Alvarado-Reyes v. Garland, 118 F.4th 462, 475 (1st Cir. 2024) (citing Sok v. Mukasey, 526 F.3d 48, 52 (1st Cir. 2008)). We therefore affirm the agency's denial of petitioners' applications for CAT relief.

## THE DECISION

For the reasons heretofore identified, we grant the petition for review in part, vacate the agency's decision insofar as it denied Mayancela's asylum and withholding of removal claims, and remand for reconsideration of Mayancela's asylum and withholding of removal claims -- and her children's derivative asylum claims -- in a manner consistent with this opinion.